## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

| | | |
|---|---|---|
| **POLLY DIANE TRANTHAM &** | ) | |
| **LAURA ANN WILLIAMS,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **CIVIL ACTION NO.** |
| **v.** | ) | **1:16-cv-1476-KOB** |
| | ) | |
| **SOCOPER, INC. d/b/a LONG LEAF** | ) | |
| **LODGE, & JAMES L. COXWELL,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM OPINION</u>

This matter comes before the court on Defendants' motion for a new trial. (Doc. 212). From June 2014 to July 2015, Plaintiff Laura Ann Williams worked for the Long Leaf Lodge. Defendant Socoper Inc. owned the Lodge and Defendant James Coxwell was Socoper's sole owner and president. During a two-week period of her employment, Ms. Williams suffered sexual and racial harassment from Socoper employees, including Mr. Coxwell. Williams spoke to her supervisor, Polly Trantham, and a friend outside the Lodge about these events. After she did so, Mr. Coxwell fired her from the Lodge.

Plaintiffs Laura Williams and Polly Trantham filed this case together in September 2016. (Doc. 1). But after Defendants initiated criminal charges against Ms. Trantham in August 2017, the court stayed the case pending the outcome of

the criminal matter. (Doc. 53). Because of numerous delays in the criminal case,[1] the court ultimately bifurcated Ms. Williams's and Ms. Trantham's claims. (Doc. 106).

In June 2021, the court held a trial for this case. Ms. Williams's claims at trial included (1) wrongful termination for racial discrimination under 42 U.S.C. § 1981; (2) retaliatory termination under § 1981; (3) invasion of privacy under Alabama law; and (4) intentional infliction of emotional distress (outrage) under Alabama law. The jury found that Defendants were not liable for racial discrimination but that Defendants were liable for all other claims. (Doc. 194). The jury awarded Ms. Williams damages as follows:

- $3,570.00 for lost wages as to the retaliation claim;

- $200,000 in compensatory damages against both Defendants collectively for emotional pain and mental anguish as to the retaliation claim;

- $200,000 in punitive damages against Coxwell for the retaliation claim;

- $200,000 in punitive damages against Socoper for the retaliation claim;

- $200,000 total in compensatory damages collectively against Defendants for the state law claims of invasion of privacy and intentional infliction of emotional distress;

- $200,000 in punitive damages against Coxwell for the state law claims;

- And $200,000 in punitive damages against Socoper for the state law claims.

(Doc. 194).

---

[1] The criminal case against Ms. Trantham still has not been tried.

Defendants now argue for a new trial based on several evidentiary grounds and on three instances of alleged fraud during the trial. Defendants also argue that the jury's damages awards were excessive. On this ground, Defendants argue for a new trial or, alternatively, a remittitur of those damages.

For the reasons explained below, the court will DENY IN PART Defendants' motion for a new trial based on the court's evidentiary rulings and the alleged fraud. But the court will GRANT IN PART Defendants' motion for a new trial or remittitur as to a portion of the damages awarded to Ms. Williams.

## LEGAL STANDARD

In general, the court "should grant a motion for a new trial when the verdict is against the clear weight of the evidence or will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." *Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.2d 1183, 1186 (11th Cir. 2001) (citation omitted). Courts of appeal review the grant or denial of a motion for a new trial under an abuse of discretion standard. *Id.*

The differing grounds on which Defendants move for a new trial entail specified standards of review. When relevant, the court will note those standards in its analysis below.

## ANALYSIS

Defendants identify six erroneous evidentiary rulings that Defendants argue entitle them to a new trial. The court will address these evidentiary rulings first. Second, the court will address Defendants' request for a new trial because of three alleged incidents of fraud or perjury in the trial. The court will then address Defendants' three bases for challenging the jury's damages award.

## I.   <u>Evidentiary Rulings</u>

Defendants' first challenges are to several of the court's evidentiary rulings. The Eleventh Circuit has instructed that "new trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great—not merely the greater—weight of the evidence." *See Lipphardt*, 267 F.3d at 1186 (citation omitted).

### a.   *The Exclusion of James Coxwell's Deposition Testimony*

Defendants seek a new trial based on the court's decision to exclude the deposition testimony of Defendant James Coxwell from the trial. Defendants first argue that the court wrongly placed the burden on Defendants—rather than Ms. Williams—to prove that Mr. Coxwell was competent at the time of his deposition. (Doc. 216 at 17). The court will address this concern before turning to whether the court properly excluded Coxwell's deposition testimony.

Federal Rule of Evidence 601 provides, "[e]very person is competent to be a witness unless these rules provide otherwise." The Eleventh Circuit has stated that

Rule 601 "provide[s] an initial presumption of competence." *United States v. Khoury*, 901 F.2d 948, 966 (11th Cir. 1990). And if a party challenges a witness's competence, the court must afford the opposing party the opportunity "to make a proffer and a record to determine the witness' ability to testify." *United States v. McRary*, 616 F.2d 181, 183 (5th Cir. 1980).[2]

This authority suggests that Defendants are correct as to the burden of proof; Ms. Williams bore the burden of overcoming the "initial presumption" that Coxwell was competent to testify at his deposition. *See Khoury*, 901 F.2d at 966. Although the court did not articulate that Williams bore this initial burden, the court finds that she carried it. In determining a witness's competence, the court may consider whether "the witness was responsive to questions and answered coherently" and whether the witness "underst[ood] the importance of his oath." *Id.* As explained below, Williams provided evidence showing that Coxwell failed to execute these tasks.

Little authority directly addresses what measure of proof overcomes the initial presumption of competence. The most helpful case is *Parrott v. Wilson*, in which the Eleventh Circuit affirmed the lower court's decision to admit the deposition testimony of a witness whose epilepsy and dementia made him

---

[2] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981. The court relies on this holding as it cites several Fifth Circuit cases throughout the opinion.

incompetent to testify at trial. 707 F.2d 1262 (11th Cir. 1983). The Circuit Court did not directly address the burden of proving competency, but the court analyzed whether the objecting party provided a "*factual basis* for a challenge to the introduction of [the deponent']s deposition on the ground that he was incompetent at the time he was deposed." *Id.* at 1269 (emphasis added). The Circuit Court found that the deponent was competent because the challenging party presented "no evidence of dementia" around the time of his deposition and presented no evidence that the deponent suffered a seizure during the deposition. *Id*.

Here, the court finds that Ms. Williams presented a "factual basis" sufficient to overcome the initial presumption of competency and to show that Coxwell was not competent to testify at his deposition. *See Parrott*, 707 F.2d at 1269. The court considered several documents when it ruled that Mr. Coxwell was not competent at the time of his deposition, including the transcript of Mr. Coxwell's deposition on June 26, 2017 (Doc. 169-6); deposition testimony from Mr. Coxwell's daughter on June 29, 2017 (Doc. 118-1); two communications from Coxwell's counsel regarding his mental condition (Docs. 40 & 126-2); Dr. Malcolm Spica's psychological examinations of Mr. Coxwell on February 6, 2020 (Doc. 169-4); Dr. Spica's second evaluation of Coxwell on September 9, 2020 (Doc. 158-1); Coxwell's medical records only dating back to July 2018 (Doc. 158-2); and various

affidavits that Defendants submitted in an effort to prove Mr. Coxwell's competency. The court will briefly revisit that evidence now.

The concerns about Mr. Coxwell's competence began shortly after his deposition taken on June 26, 2017. In the deposition, Ms. Williams's counsel asked Mr. Coxwell about a document bearing what appeared to be Coxwell's signature. (Doc. 169-6 at 55). Coxwell denied that he signed it, calling it a "good fake." (*Id.*).

But three days after Coxwell's deposition, Ms. Williams's counsel deposed Mr. Coxwell's daughter, Cam Shiflett. Counsel asked Ms. Shiflett about the "good fake." (Doc. 118-1 at 3). She stated that the signature on the document was in fact Coxwell's signature. She testified:

> Q: Okay. Are you aware that in his deposition on Monday your father denied having any knowledge of Plaintiff's Exhibit 8?
>
> A: My dad is in the first stages of dementia.
>
> Q: Are you aware that your father testified that he did not have any medical condition that affected his memory or his ability to testify?
>
> A: It's part of it, they don't realize it.
>
> Q: What doctor has diagnosed him with dementia?
>
> A: I can give you a name today. He's at a doctor's office today.
>
> Q: No, ma'am. Prior to his deposition, who has diagnosed him with dementia?
>
> A: Well, I can give you that name when I call and ask.
>
> Q: Okay. Are you aware of anyone having diagnosed your father with dementia prior to his deposition?

A: I'm not for certain, but I just know that he has the beginning stages of it. He owns an assisted living, so we kind of, you know, deal with that.

Q: What doctor is he seeing today?

A: I don't know the name of the doctor. I can find that information out. I didn't know I'd need it today.

(Doc. 118-1 at 3).

The court's doubts about Mr. Coxwell's competency first arose when Coxwell's counsel provided a status report to the court on July 5, 2017—nine days after Coxwell's deposition. That report stated: "Defense counsel understands that Defendant Coxwell is likely suffering from early onset Alzheimer's disease, which may affect his capacity to testify and create the potential for medical testimony." (Doc. 40 at 3).

Because of the stay in this case, the parties' trial preparations did not begin in earnest until late 2020. In a series of conferences and hearings beginning in September 2020, Ms. Williams's counsel reiterated the above information, which, at the very least, raised genuine concerns about Coxwell's competency. The court shared counsel's concerns about Coxwell's competence and the need for Coxwell's medical records from around the time of deposition in 2017 related to his mental health and treatment. (Doc. 240 at 40). Coxwell's counsel stated that he would provide those records. (*Id.* at 41). And as explained in the court's prior opinion, the court reiterated in conferences on September 9, 2020 and September 10, 2020, and

in a hearing on October 15, 2020 that the court was looking for evidence of Coxwell's competence in 2017, rather than mere statements from Coxwell's counsel that he was competent at his deposition. (Doc. 179 at 3). In those settings, Coxwell's counsel repeatedly confirmed that he would provide medical records from around 2017, but Defendants never did so. Nor did they provide the name of the doctor Coxwell saw three days after his deposition, as Ms. Shiflett offered to do.

The only medical records that Defendants provided contributed to—rather than resolved—the concerns about Mr. Coxwell's competence in 2017. The earliest record is dated July 10, 2018—a year after Coxwell's deposition. (Doc. 158-2 at 4). It states that, at the time of that examination, Coxwell was already taking Aricept and that he had a diagnosis of "Alzheimer's dementia." (*Id.*). But importantly, it does not state *when* Coxwell received that diagnosis and prescription, or from whom. The examining physician also noted that Mr. Coxwell was "forgetful[,] pleasant and cooperative but could not always provide needed information." (*Id.*). In May 2019, Coxwell's doctor added a prescription for a medication called Sertraline to treat his "memory loss." (*Id.* at 6).

The court concludes that this evidence overcomes the "initial presumption" that Mr. Coxwell was competent to testify at his deposition in 2017. *See Khoury*, 901 F.2d at 966. Medical records show that Coxwell took mental health drugs and

had a diagnosis of Alzheimer's prior to his doctor visit reflected in the July 2018

medical record. And Coxwell's daughter, Cam Shiflett, revealed that he visited a

doctor three days after his deposition regarding his mental health. Ms. Shiflett also

testified that he was suffering from "the first stages of dementia." (Doc. 118-1 at

3). While she was not a medical expert, Shiflett testified to her familiarity with

signs of dementia through her work at the assisted living facility. (*Id.*). And only

nine days after Coxwell's deposition, his counsel advised the court that he was

likely suffering from early onset Alzheimer's disease, raising the "potential for

medical testimony." Unlike in *Parrott*, Ms. Williams presented ample evidence of

Coxwell's Alzheimer's or dementia around the time of his deposition. *See Parrott*,

707 F.2d at 1269

Following the guidance of *Parrott*, the court also considered Mr. Coxwell's

deposition testimony. (Doc. 169-6). In the hearing on February 23, 2021, the court

noted its concerns about Mr. Coxwell's apparent inability at the deposition to

remember his full street address; his inability to remember any information about

prior depositions that he may have testified in; his confusion and inability to

remember his business practices concerning document retention; and numerous

answers reflecting that Coxwell either did not understand "the seriousness of the

deposition," or that he did not possess the mental capacity to answer questions.

(Doc. 189 at 13–14). And the court identified several other examples of troubling

testimony in its later opinion. (Doc. 179 at 6–7).

Revisiting the deposition testimony for purposes of this motion, the court also notes that Mr. Coxwell's ability to answer appeared to deteriorate as the deposition progressed. For several pages of questioning, Coxwell repeatedly responded that he could not remember any details about the who, when, and why of his alleged reasons for firing Ms. Trantham—a key fact in dispute. (Doc. 169-6 at 48–48). That line of questioning and another fairly straightforward line of questioning ended with Coxwell needing to take breaks from the deposition because he "didn't understand" and was "very confused." *See* (doc. 169-6 at 49–50; 60–61).

Also, when the questioning first addressed Plaintiff Laura Williams, Coxwell could not recall her name. (Doc. 169-6 at 51) ("Q: And who were those maids? A: I think one of their names was Laura. Was it Laura? Q: Mr. Stewart can't answer for you. He is not under oath."). And in response to two lines of questioning, Coxwell stonewalled Ms. Williams's counsel. (Doc. 169-6 at 58) ("Q: When you said that you told her to quit harassing employees, what was she doing to harass employees? A: Playing jokes. Q: Such as? A: Jokes. Q: Such as? A: Jokes. Q: Such as? A: Just jokes. Q: Such as? A: Tricks."); *see also* (*id.* at 46).

So, in revisiting Mr. Coxwell's deposition, the court stands by its prior finding that the transcript "does not show him to be clearly competent," as defense

counsel had asserted. (Doc. 179 at 7). The court also notes that the Eleventh Circuit in *Parrott* consulted the deposition transcript to support its competency analysis only because the party challenging the use of the deposition provided *no other evidence of dementia*. *Parrott*, 707 F.2d at 1269. But the court has already outlined Ms. Williams's significant evidence of Coxwell's memory issues at the time of his deposition.

Defendants respond to this evidence with several affidavits from three of Mr. Coxwell's employees and business associates. For one thing, only two of these affiants knew Mr. Coxwell in June 2017, the critical time for this analysis. *See* (docs. 169-1 & 169-2). So only those two affidavits bear on his competency "during the period in which he was deposed." *See Parrott*, 707 F.2d at 1269. And those two affidavits only speak in broad terms about Mr. Coxwell's ability to manage his business over a long period of time. Unlike Ms. Shiflett's testimony about Coxwell's memory problem concerning his allegedly fake signature, the affidavits offer no examples of interactions that demonstrated Mr. Coxwell's competence in 2017. So, the court finds little value in the affiants' conclusory claims that "throughout June of 2017, Mr. Coxwell always appeared to be competent in all of my dealings with him." (Doc. 169-1 at 2; doc. 169-2 at 2).

Defendants also offer Dr. Malcolm Spica's first mental examination of Mr. Coxwell conducted on February 6, 2020. (Doc. 169-4). Several of Dr. Spica's tests

indicated that Coxwell's "general cognitive functioning" ranked in a "significant classification for impairment," including a "Memory Index" test in which Coxwell scored in the "<1st percentile." (*Id.* at 4). Coxwell also scored in less than the first percentile on several other memory ability tests. (*Id.* at 5). Overall, Dr. Spica stated that his "findings indicate isolated but significant decrements in memory functioning." (*Id.* at 6). Even so, Dr. Spica concluded: "I defer a diagnosis of dementia until patient's overall cognitive pattern demonstrates more uniform decline." (*Id.*). Dr. Spica diagnosed Coxwell with "Mild Cognitive Impairment." (*Id.*).

The court finds this report to be just a tad more helpful than Defendants' affidavits in assessing Coxwell's competence. Dr. Spica performed his analysis almost twenty months after Coxwell's deposition, and he did not comment on how long Coxwell's mental abilities had been impaired. And Coxwell's poor performance on the memory tests do not assuage the court's concerns that Coxwell suffered mental challenges in 2017 that rendered him incompetent to testify.

Further, the court reads this report alongside a similar assessment that Dr. Spica performed five months later, in September 2020. At that time, Dr. Spica found "significant declines compared to [Mr. Coxwell's] 2/06/20 examination," and he concluded that Coxwell was not competent to testify at trial in this case. (Doc. 158-1 at 7). But Dr. Spica' September 2020 report also noted that "persons

who interact with Mr. Coxwell on a casual basis are likely to overestimate his cognitive capabilities due to his personable and responsive interpersonal style." (*Id.*). This statement casts doubts on Defendants' affidavits because Dr. Spica specifically stated that lay people in casual interactions would be unable to accurately assess Coxwell's mental abilities.

As such, the most helpful evidence as to Coxwell's mental abilities in 2017 would have been Coxwell's medical records, prescriptions, or diagnoses from around that time. To be sure, Defendants' counsel repeatedly *argued* that Coxwell's former doctors' office closed, that they had spoken with that doctor's former nurse, and that counsel's diligent search uncovered no other medical records. (Doc. 189 at 16, *et seq.*). But at the February 23 hearing, the court made clear to counsel that "your [unsworn] word is not evidence of the non-existence of the records that we have been seeking." (Doc. 189 at 18). The court specifically stated that it was looking for *evidence*, such as affidavits from Coxwell's former doctors or nurse practitioners regarding the absence of medical records. (Doc. 189 at 17–18). But Defendants failed to follow this instruction, both when they proffered Coxwell's deposition testimony at the trial and now. *See* (doc. 230 at 10 *et seq.*). Nor did they ever offer an affidavit about their diligent but non-productive search.

Finally, Defendants blame Ms. Williams for failing to pursue discovery that

would support her claim that Coxwell was incompetent at his deposition. At trial, Defendants argued that Williams's counsel should have "stopped" Ms. Shifflet's deposition when Shiflett testified about Coxwell's doctor visit to depose that doctor. (Doc. 230 at 13). But Ms. Shifflet did not know the doctor's name, she offered to provide it later, and Defendants later declined Ms. Williams's and this court's repeated requests to provide the doctor's name after the deposition. (Doc. 189 at 22–23) ("We have yet to get the name of this mystery doctor from 2017, and I would ask that Mr. Stewart identify that doctor on the record today."). Defendants also challenge Williams's failure to depose Dr. Spica. (Doc. 216 at 18). But deposing Dr. Spica regarding his assessments in 2020 would not clarify Coxwell's condition in 2017. And the court will not fault Williams's reliance on Defendants' repeated—and ultimately, empty—promises to provide the 2017 medical records.

In sum, the court finds that Williams's evidence overcame the "initial presumption" of Mr. Coxwell's competence at the deposition in 2017. The court also finds that Defendants' affidavits and mental health reports do not adequately show that Coxwell was competent to testify at the time of his deposition in 2017. So, the court will not grant a new trial on this ground.

### b.  The Exclusion of Certain Portions of Tori Williams's Testimony

Defendants next argue for a new trial based on the court's decision to

exclude certain testimony that may have been offered by Tori Williams, the manager of the Long Leaf Lodge in July 2015. Defendants argue that the court wrongly prohibited them from offering Tori Williams's testimony as to three categories of evidence: (1) "her personal observations about Plaintiff's poor job performance," (2) "her knowledge about the financial condition of Long Leaf Lodge," and (3) "the articulated legitimate reasons the Defendants had for laying off the Plaintiff." (Doc. 216 at 22). After the sidebar concerning the Plaintiff's objections to Tori Williams's testimony, Defendants *chose* not to call Tori Williams as a witness at all, and they made no proffer of her proposed testimony. (Doc. 229 at 133).

The trial transcript reveals that the court *did not prevent* Defendants from eliciting Tori Williams's testimony as to the first two categories of evidence, but Defendants chose not call her. First, the Plaintiff objected to any testimony from Tori Williams that she recommended to Mr. Coxwell that he fire the Plaintiff because such testimony would be "speculating or offering hearsay." (Doc. 229 at 123). The court sustained the objection on narrow grounds: "I will allow you to ask [Tori Williams] about information she provided [to Coxwell] on *the financial condition of the lodge*, but nothing about making a recommendation to Coxwell" about firing the Plaintiff. (Doc. 229 at 131) (emphasis added). So, this portion of the ruling addresses Defendants' first category of evidence; the court permitted

16

Tori Williams to testify as to financial conditions, but Defendants chose not to call her as a witness.

Second, the court ruled that it would also permit Defendants to elicit Tori Williams's testimony regarding "the performance of the people that worked there," subject to the prior limitation that such testimony could not include her alleged recommendation to fire the Plaintiff. (Doc. 229 at 131–32). Again, this portion of the ruling permitted the second category of evidence that Defendants now raise.

The court construes Defendants' third contention to challenge the court's ruling that Tori Williams could not testify that she "recommended terminating staff" to Mr. Coxwell. (Doc. 229 at 131). The court reasoned that such testimony would improperly "put out speculation . . . that Mr. Coxwell relied on that recommendation and that was why he terminated [the Plaintiff]." (Doc. 229 at 131). The court reached this conclusion based on Defendants' stipulation before trial that "Mr. Coxwell made the decision to terminate Ms. Williams's employment." *See* (doc. 125 at 3). The court also noted that Coxwell never testified that he relied on Tori Williams's recommendation in firing Plaintiff Williams. (Doc. 229 at 128). And Plaintiff's counsel asserted that Defendants' interrogatory responses identified Jim Coxwell as the sole decision maker

concerning Plaintiff's termination. (Doc. 229 at 126).[3]

Defendants argue that the court wrongly excluded the "recommendation" testimony because "Coxwell clearly testified . . . that Tori Williams fired the Plaintiff." (Doc. 216 at 21). But when asked who fired Laura Williams, Coxwell responded at his deposition, "I don't remember. But I would assume it was Tori." (Doc. 169-6 at 61). So Coxwell did not "clearly testify" on this point. And although Tori Williams testified in her deposition that she "participated" in the decision to fire the Plaintiff, she made clear that the "ultimate final decision" rested with Mr. Coxwell. (Doc. 213-8 at 61). Had Defendants intended to elicit testimony from Tori Williams about her firing recommendation, they should not have stipulated that Coxwell termed and swore in interrogatories that he was the sole decision maker.

The court finds no error in its prior ruling. The court permitted Tori Williams to testify as to the factors allegedly contributing to the firing decision— Plaintiff's job performance and the Lodge's financial circumstances. But the parties stipulated that Coxwell fired the Plaintiff, and Coxwell's interrogatories listed Coxwell as the sole decisionmaker. So the court excluded Tori Williams's testimony about a firing recommendation because that testimony could mislead the

---

[3] The court did not ask Plaintiff's counsel to substantiate that assertion by producing Defendants' discovery responses because that point had been addressed numerous times previously. *E.g.*, (Doc. 125 at 3).

jury into substituting her *recommendation* reasons for Defendants' actual *firing* reasons.

The blame rests with Defendants that Tori Williams did not testify at trial as to the first two categories of evidence challenged here. And the court finds no error in its ruling as to the third category.[4] So the court will deny the motion for a new trial on this ground.

### c.   *The Limits on Cross Examining Ms. Trantham Concerning Mr. Coxwell's Divorce Proceeding*

Mr. Coxwell went through a divorce in 2015, and Ms. Trantham and Ms. Williams gave deposition testimony against Mr. Coxwell in that proceeding. Defendants now argue that the court wrongly prohibited them from asking Ms. Trantham how Ms. Williams ended up on the witness list in the divorce case and why Trantham never "said anything about Coxwell's alleged racial discrimination or their claims about the sexual advances" in the divorce case. (Doc. 216 at 24). Defendants clarify their argument with a string cite of trial transcript pages in which the court issued several evidentiary rulings. (*Id.* at 26).

The court has reviewed these portions of the trial transcript and finds no grounds for a new trial. First, Defendants cite to the court's decision in

---

[4] The parties also dispute the significance of Plaintiff's counsel's reliance on the *IMPACT* case in the trial's sidebar discussion concerning Tori Williams's testimony. *See* (doc. 229 at 127) (citing *Increase Minority Participation by Affirmative Change Today v. Firestone*, 893 F.2d 1189 (11th Cir. 1990)). But the court did not rely on that case for its trial ruling or in the above analysis. So the court need not address that case here.

*Defendants'* favor regarding Ms. Trantham's deposition transcript from Coxwell's divorce proceeding. (Doc. 229 at 11). At trial, Defendants sought to read portions of Ms. Trantham's deposition transcript from Coxwell's divorce case and to examine her about that testimony. (*Id.*). The court ruled that Defendants *could* provide copies of that deposition transcript to opposing counsel and cross-examine Trantham about it. (*Id.* at 12). Defendants proceeded with that line of questioning, but the record does not reflect whether they later provided a copy of the transcript to opposing counsel. (*Id.* at 13). So, the court does not see how this decision in Defendants' favor warrants a new trial.

Next, Defendants cite to another decision in their favor—overruling the Plaintiff's objection to cross examination questions to Ms. Trantham concerning *her* performance at the Lodge. (Doc. 229 at 20) ("The Court: . . . We need to soon get to Ms. Williams. Mr. Stewart: Okay. Okay. We will. The Court: *I will overrule that objection*, but this case here is about Ms. Williams.") (emphasis added). The court does not see how its ruling in Defendants' favor limited their cross examination of Ms. Trantham, especially because Defendants abandoned that line of questioning after the court overruled Plaintiff's objection.

Lastly, Defendants challenge the court's decision to prohibit Defendants from *further* questioning Ms. Trantham about her role in the divorce proceedings between Mr. Coxwell and his wife. Aside from showing bias, Defendants argue

that this evidence would show inconsistent prior statements by Ms. Trantham and proof of Ms. Williams's colluision against Mr. Coxwell. (Doc. 216 at 25).

The court disagrees; Trantham's prior statements in the divorce proceeding are not "inconsistent" with the testimony offered in this case. Defendants argue that Trantham and Williams *never testified* about Coxwell's alleged racism and harassment in the divorce proceedings, and that the absence of that testimony conflicts with their current claims. But a prior inconsistent statement exists only when the prior statement "contradict[s] the declarant's direct testimony in some material respect." *See Lewis v. Ins. Co. of N.A.*, 41 F.2d 1077, 1080 (5th Cir. 1969). Tranham's lack of testimony in Coxwell's divorce case—particularly, testimony about racial and sexual discrimination claims that were not relevant in that case—did not contradict her testimony in this case's trial.

### d. *The Limits on Cross Examining Ms. Williams Concerning Mr. Coxwell's Divorce Proceeding*

As with Ms. Trantham, Defendants argue that the court erred in prohibiting them from cross-examining Ms. Williams about her participation in Coxwell's divorce case. (Doc. 216 at 24). But the string cite in which Defendants identify the court's allegedly incorrect decisions contains no references to decisions concerning Defendants cross-examination of Ms. Williams. (*Id.* at 26). So the court has

difficulty construing Defendants' argument on this point.[5]

Even so, the court stands by its decision to prohibit Defendants from cross examining Ms. Williams about her alleged testimony in Coxwell's divorce case because Defendants never produced the transcript of Williams's deposition in the Coxwell divorce case. So their questioning Williams about her testimony in the divorce case would "assum[e] that she was asked questions about matters that are at issue here. We don't have the transcript [of the divorce deposition] to know whether they were or not." (Doc. 228 at 90). And Ms. Williams's deposition in this case confirms this point: when asked whether she discussed her sexual and racial discrimination claims in the divorce proceeding, Ms. Williams responded, "*No sir, they didn't ask anything about that*." (Doc. 214-15 at 25). Both at trial and now, the court cannot assess the relevance of Williams's alleged testimony, which Defendants never proffered.

The court finds no merit to Defendants' claim that they could not adequately cross examine Ms. Williams. The court will deny the motion for a new trial on this ground.

### e. *The Limits on Questioning Ms. Trantham about Her Alleged Theft*

---

[5] The court also notes that Defendants' brief contains two additional sections arguing that the court erred when it "cut off Defendants' cross-examination of Plaintiff Williams and Trantham regarding Coxwell's divorce proceeding." (Doc. 216 at 28, 30). The court can hardly distinguish these arguments from those addressed in subsections c. and d. above, and Defendants fail to cite to any other portions of the trial transcript to support the additional arguments. So, the court adopts its analysis from subsections c. and d. as to those argument as well.

In 2017, Mr. Coxwell initiated state criminal charges against Ms. Trantham for alleged theft, claiming she raised her own pay while she was the Long Leaf Lodge's manager. *See* (Doc. 86 at 2; Doc. 98 at 2). Defendants argue that the court should have permitted them to inquire into the facts underlying the criminal charges because those facts show Ms. Trantham's character for truthfulness. (Doc. 216 at 33) (citing Fed. R. Evid. 608(b)).

As an initial matter, the court notes that Defendants could not impeach Ms. Trantham under Federal Rule of Evidence 609 based on her pending criminal charges because that rule only permits impeachment based on "evidence of a criminal *conviction*." *See* Fed. R. Evid. 609(a). But Defendants argue that the court erred in prohibiting them from asking about Trantham's alleged fraud as a specific instance of conduct bearing on her character for truthfulness under Federal Rule of Evidence 608(b).

In a pretrial hearing on September 10, 2020, the court granted Ms. Williams's motion in limine concerning these allegations. The court ruled that Defendants could not discuss that Trantham was arrested or charged for theft and that Defendants could not ask about Trantham's "pay records or allegations that she stole from her employer." (Doc. 244 at 15).

The court finds no error in its decision to exclude this evidence. Defendants argue that they would have elicited testimony about the alleged theft "to rebut trial

23

testimony by Trantham that she was the person who kept the lodge running and making a profit." (Doc. 216 at 34). As an initial matter, Rule 608 permits evidence of specific instances of conduct bearing on "the witness's character for truthfulness." Fed. R. Evid. 608(b). But the Eleventh Circuit has indicated that alleged theft does not fall in this category. *See United States v. Sellers*, 906 F.2d 597, 603 (11th Cir. 1990) ("While the defendants argue the admissibility [of pending theft charges] as prior conduct bearing on truthfulness under Fed. R. Evid. 608(b), theft . . . has no such bearing."). Further, the theft questioning carries little impeachment value because, without a criminal conviction, these questions would only rely on Defendants' self-serving *allegations*. Permitting Defendants to pose questions about facts regarding alleged theft would subject Ms. Trantham to serious prejudice, with little probative value to Ms. Williams's claims. *See United States v. Smith*, 277 F. App'x 870, 872 (11th Cir. 2008) (finding that evidence admissible under Rule 608(b) may still be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice"). So the court's exclusion of this evidence presents no ground for a new trial.

## II.   <u>Alleged Fraud and Perjury in the Trial</u>

Defendants also move for a new trial, arguing that (1) Plaintiff's counsel engaged in discovery misconduct by failing to produce Polly Trantham's complete EEOC file; (2) Ms. Trantham perjured herself when she testified that she first

made her sexism and racism allegations in an "attachment" to her EEOC charges; and (3) both Trantham and Williams perjured themselves when they testified that Trantham did not assist Williams in filing her EEOC charges. The court will address each argument in turn.

For these claims, Defendants request a new trial under Rule 60(b)(3). That rule provides:

> The court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:
>
> . . .
>
> (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party.

Fed. R. Civ. P. 60(b). Although the rule permits the court to grant Defendants relief from the judgment, Defendants request a new trial.

The party moving for relief under Rule 60(b) bears the burden of proving fraud by "clear and convincing" evidence, and that "the conduct prevented the losing party from fully and fairly presenting his case or defense." *Frederick v. Kirby Tankships, Inc.*, 205 F.3d 1277, 1287 (11th Cir. 2000). But the movant need not show that the case's result would have differed but-for the fraud. *Wilson v. Thompson*, 638 F.2d 801, 804 (5th Cir. 1981).

Generally, a party may not seek a new trial based on *newly discovered evidence* when the party failed to exercise "reasonable diligence" to discover the evidence before trial. Fed. R. Civ. P. 60(b)(2); *see also Michael Linet, Inc. v.*

*Village of Willington, Fla.*, 408 F.3d 757, 763 (11th Cir. 2005) (stating that the reasonable diligence rule also applies to motions for a new trial under Rule 59(e)). But Defendants' moves for a new trial based on fraud under *Rule 60(b)(3)*, and the language of that provision imposes no reasonable diligence requirement.

Even so, a party moving for a new trial under Rule 60(b)(3) must prove that the fraudulent "conduct prevented the moving party from fully and fairly presenting his case." *Harre*, 750 F.2d at 1503 (citation omitted). And some courts have recognized that this element implies that a party may not obtain relief under Rule 60(b)(3) if it "had notice of facts that should have led to discovery of the alleged fraud." *In re Hope 7 Monroe Street Ltd. Part.*, 743 F.3d 867, 875 (D.C. Cir. 2014); *see also Travelers Cas. & Sur. Co. v. Crow & Sutton Assoc.*, 228 F.R.D. 125, 132 (N.D.N.Y. 2005) ("This is not a case where a party actively attempted to prevent the opponent from gaining access to important evidence. To the contrary, the existence of the documents was asserted and prominently displayed, and [Defendant] could have easily obtained it."). As a leading treatise puts it, "Rule 60(b) should not reward the lazy litigant who did not adequately investigate his or her case, or who did not vigorously cross-examine a witness." 12 Moore's Federal Practice—Civil § 60.43(c).

This authority aligns with Eleventh Circuit precedent interpreting Rule 60(b)(3). In one case, the Circuit Court addressed a witness's omitting key

information from his testimony under Rule 60(b)(3). *Taylor v. Texgas Corp.*, 831 F.2d 255, 259 (11th Cir. 1987). But the court found no fraud because "counsel for [Defendant] declined to cross examine [the witness]" and because the Defendant failed "to file a brief and to present further evidence prior to the court's final decision." *Id.* at 259–60.

This court interprets *Taylor* as asserting that the fraud analysis under 60(b)(3) *may* consider counsel's diligence in cross examination as to the challenged testimony. After all, the movant under Rule 60(b)(3) must prove that the allegedly fraudulent *conduct* prevented his full and fair representation of the case; when the movant's *own inaction* prevented his presentation of conflicting evidence, that element is not met. *See Waddell v. Hendry Cnty. Sheriff's Off.*, 329 F.3d 1300, 1310 (11th Cir. 2003) ("Neither did the district court abuse its discretion by denying relief under Fed. R. Civ. P. 60(b)(3). It was Plaintiffs' tactical decisions, not fraud by Defendants, that prevented Plaintiffs from fully presenting their case.") (citing *Taylor*). When relevant, the court will consider as one factor in its fraud analysis Defendants' diligence prior to trial and in cross examination concerning the evidence underlying their fraud claims.

### a. *Williams's Counsel's Alleged Discovery Misconduct by Failing to Produce Trantham's Complete EEOC File*

As part of their theory that Ms. Trantham helped Ms. Williams concoct her EEOC claims, Defendants argue that Trantham fabricated many of her sexual

harassment and racism allegations after Trantham filed her initial EEOC charge. (Doc. 216 at 36). But Trantham testified that she identified all her claims from the outset in an "attachment" that she sent to the EEOC. Counsel for Williams and Trantham never produced Trantham's alleged attachment during discovery.

*After trial*, Defendants obtained a copy of Trantham's complete EEOC file, which included the EEOC's "Intake Questionnaire." (Doc. 214-27).[6] In the Questionnaire, Trantham described her allegations, but she did not include the allegations that Trantham claims were in her "attachment." See (doc. 214-27 at 3). Defendants now argue that Williams's counsel committed discovery misconduct by failing to produce Trantham's complete EEOC file, including the Questionnaire. (Doc. 216 at 40).

One potential ground for relief under Rule 60(b)(3) is a party's "withholding information called for by discovery." *Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1339 (5th Cir. 1978). Ms. Williams's brief does not dispute that her counsel possessed Trantham's Intake Questionnaire before the trial. (Doc. 221 at 36). Nor does she dispute that the Questionnaire was responsive to Defendants' first request

---

[6] Defendants do not explain how they acquired Trantham's EEOC file, but their reply brief does not dispute Plaintiff's contention that they received it from the EEOC in response to a subpoena issued after trial. The court notes that, from its more than twenty years of observation of employment discrimination cases, defense counsel routinely subpoena EEOC files as one of their *first* steps in defending such cases. Williams and Trantham originally brought claims under both Title VII and §1981, and they had filed charges with the EEOC. Had defense counsel subpoenaed the EEOC prior to trial, these issues would have and could have been covered in cross-examination at trial, where the jury could have determined the truth.

for production, which sought "all documents" concerning the parties' knowledge of Defendants' racial and sexual discrimination.

Instead, Williams argues that her counsel bore no duty to produce Trantham's questionnaire because her response to Defendants' request for production stated:

> Plaintiffs object to this request because as written it would include communications between the Plaintiffs and their attorney and/or documents Plaintiff[s] may have created for their attorney. Further, as written the scope of the request is overly broad and vague, therefore making it difficult if not impossible to identify all documents which could be responsive to this request. Subject to, and without waiving any objections, Plaintiff[s] state that they have identified and produced in their initial disclosures *the documents on which they may rely in this action*.

(Doc. 221-1 at 1–2). Ms. Williams did not call Trantham as a witness at trial, and she did not rely on the Questionnaire. So, Ms. Williams now argues that she bore no duty to produce the Questionnaire because her case did not rely on it. (Doc. 221 at 36).

The court agrees with Ms. Williams. Parties commit "misconduct" under Rule 60(b)(3) when they fail to produce documents "clearly called for 'by any fair reading' of the discovery order." *Montgomery v. Hall*, 592 F.2d 278, 279 (5th Cir. 1979) (per curiam) (quoting *Rozier*, 573 F.2d at 1341). Here, Ms. Williams validly objected to Defendants' discovery request, and her objection indicates that she would produce only those documents on which her case relied. So Williams bore

no duty to produce the Questionnaire because she did not rely on it.

If Defendants opposed Williams's discovery objection, they should have filed a motion to compel. *See* Fed. R. Civ. P. 37. To be sure, the discovery rules do not limit the scope of discovery to those documents on which a party will "rely in this action." *See* Fed. R. Civ. P. 26(b). But parties commonly construe discovery requests narrowly and "yield ground grudgingly." *See Harduvel v. General Dynamics Corp.*, 801 F. Supp. 597, 608 (M.D. Fla. 1992) (citation omitted). Indeed, Defendants' only authority is a case where the offending party's non-disclosure violated a *court order* issued on the movant's prior motion to compel. *See Rozier*, 573 F.2d at 1340; *see also Montgomery*, 592 F.2d at 279. Although Defendants now argue that Williams's counsel bore a "professional responsibilit[y] with respect to being fair with the other side during the discovery phase" (Doc. 226 at 12), Defendants filed no motion to compel. So, they may not oppose Williams's discovery response for the first time in a motion for new trial.

Because Ms. Williams bore no duty to produce Trantham's complete EEOC file, the court finds no discovery misconduct warranting a new trial.

### b. *Ms. Trantham's Alleged Perjury Concerning Her "Attachment" to the EEOC Charge*

At trial, Defendants attempted to contrast Ms. Trantham's first EEOC charge, which lacked some of her sexual harassment and racism allegations, with her second EEOC charge, which contained them. (Doc. 229 at 65 *et seq.*).

Trantham has long maintained that she stated all of her claims from the outset in an "attachment" to her first EEOC charge. As described above, Defendants obtained a copy of Trantham's EEOC "Intake Questionnaire" from the EEOC after trial. (Doc. 214-27). The Questionnaire contains Ms. Trantham's handwritten responses to questions about her allegations, but those responses do not contain the allegations that Trantham claims were in her "attachment." *See* (doc. 214-27 at 3). The Questionnaire is dated August 1, 2015.

Defendants now argue that the Questionnaire *is* Trantham's "attachment," and that the absence of her complete allegations in the Questionnaire shows that she perjured herself by testifying that the "attachment" contained all her claims. Ms. Williams does not dispute that the Questionnaire lacks Trantham's additional sexual and racial discrimination allegations. But she argues that Defendants do not provide clear and convincing evidence that the Questionnaire is Trantham's attachment about which she testified. (Doc. 221 at 34). The court agrees.

Perjury constitutes fraud for purposes of Rule 60(b)(3). *Rembrandt Vision Tech., L.P. v. Johnson & Johnson Vision Care, Inc.*, 818 F.3d 1320, 1325 (Fed. Cir. 2016) (applying 11th Circuit law). But the moving party must still provide clear and convincing evidence of false testimony. *Id.* To meet this burden, the challenged testimony typically must contradict either undisputed documentary evidence or the witness's own testimony in another case. *See Rembrandt Vision*

*Tech., L.P.*, 818 F.3d at 1323 (documents showing expert witness's perjury were so one-sided that parties did not dispute the falsity of his testimony); *Bonar v. Dean Witter Reynolds, Inc.*, 835 F.2d 1378, 1385 (11th Cir. 1988) (letters from universities stated that witness who claimed to be their student was not); *Harre v. A.H. Robbins Co., Inc.*, 750 F.2d 1501, 1503 (11th Cir. 1985) (expert witness testified that he conducted relevant studies in one case but testified that he never conducted those studies in another case).

As early as her deposition in May 2017, Trantham explained that she "submitted [a] written statement attached" to her first EEOC charge detailing all her claims. (Doc. 214-7 at 51). At her deposition, she described this attachment both as "a written statement" and "a typed letter." (*Id.* at 51–52).

At trial, Ms. Trantham reiterated that her initial EEOC charge "was amended, sir, because a mistake was made." (Doc. 229 at 67). She again explained that the EEOC investigator helped her complete her first charge, dated September 24, 2015, but he "lost part of the supplemental paperwork to it," including her attachment. (*Id.* at 34). As to the attachment, she stated that she "typed it out and attached it to the first form that [she] filled out." (*Id.* at 68). The court then pressed for clarification:

> The Court: I think you said earlier that you first did it in handwriting?
> [Ms. Trantham]: Yes, it was handwritten.

(Doc. 229 at 68). This testimony indicates that Trantham sent a handwritten "attachment" with her initial EEOC charge, which an EEOC investigator completed on September 24, 2015.

But Trantham later testified that she re-sent a second attachment when she noticed that the September 24 EEOC charge did not include the contents of her first attachment:

> Q: My question is, did you send additional information in after 9-24 of 2015?
>
> A: Yes, I did.
>
> Q: And that was after—after he had gotten this initial information from you?
>
> A: That's correct.
>
> . . .
>
> The Court: So, let me ask this: The information that you sent to him after you got [the September 24 EEOC charge] and it didn't have all the information, and he said he didn't have the attachment, did you then send him the missing attachment?
>
> The Witness: Yes, I did.

(Doc. 229 at 70–71).

Based on this evidence and testimony, the court does not find "clear and convincing" evidence that the Questionnaire is the attachment that Ms. Trantham repeatedly testified about. *See Frederick*, 205 F.3d at 1287. Trantham repeatedly testified that she "attached" her notes "to the first form that [she] filled out." (Doc. 229 at 68). But the Questionnaire itself is a "form"—not an attachment—that

Trantham "filled out" with her responses to the printed questions. Nothing makes this plainer than the Questionnaire itself, which invites the charging party to "attach additional pages if needed." (Doc. 214-27 at 3). Nor does the Questionnaire appear to be a "supplement" that she "attached" to the EEOC documents; it *is* an EEOC document. (Doc. 229 at 34). In other words, Trantham's testimony distinguishing her attachment from the EEOC forms makes little sense if the Questionnaire is the attachment, as Defendants now argue.

Equally problematic is Defendants' assumption that Trantham's EEOC file would contain her attachment in the first place. Trantham testified that the EEOC *lost* her first attachment; so, the Questionnaire could not be that document because the Questionnaire was not lost. Further, Trantham testified that she re-sent her second attachment sometime after September 24, 2015. (Doc. 229 at 68). But the Questionnaire is dated August 1, 2015. And although Trantham testified that her first attachment was handwritten, her testimony indicates that her second attachment may have been typed out, unlike the Questionnaire. (Doc. 229 at 68; doc. 214-7 at 52). So the court does not find "clear and convincing" evidence of perjury based solely on the presence of a single handwritten Questionnaire in Trantham's file.

Finally, the strength of Defendants' evidence of alleged perjury comes nowhere near that in cases finding misconduct under Rule 60(b)(3). Neither

Williams nor Trantham admit the falsity of Trantham's statements. *See Rembrandt Vision Tech., L.P.*, 818 F.3d at 1323. And as explained, the EEOC documents do not *indisputably* show Trantham's perjury. *See Bonar*, 835 F.2d at 1385; *Harre*, 750 F.2d at 1503.

Because the court does not find clear and convincing evidence that the Questionnaire is Ms. Trantham's attachment, the Questionnaire does not contradict Trantham's testimony that she submitted her additional claims in another attachment. So the court will deny Defendants' motion for a new trial based on alleged perjury about an attachment.

### c.  *Ms. Trantham and Ms. Williams's Alleged Perjury Concerning Trantham's Assistance with Williams's EEOC Claims*

Defendants' final argument for a new trial alleges that both Ms. Trantham and Ms. Williams perjured themselves when they testified that Trantham did not assist Williams in developing her EEOC claims. As support, Defendants point to two pages of handwritten notes that Ms. Williams attached to her EEOC charges, which substantiate her discrimination allegations. (Doc. 214-28).[7] At trial, Williams testified that these two pages were her notes and that Trantham never assisted her in "putting together" her EEOC claims. (Doc. 228 at 61, 69).

But since acquiring Trantham's EEOC file after trial, Defendants note that the handwriting in *Trantham's* file resembles the first page of *Williams's*

---

[7] The court cites to Defendants' exhibit, but a clearer version of Williams's notes is available at Doc. 214-16 at 28–29.

handwritten notes. Defendants now argue that Ms. Trantham *wrote* the first page of the handwritten notes that Ms. Williams claimed to be her own. Because Trantham allegedly wrote Williams's EEOC notes, Defendants argue that both Trantham and Williams falsely testified that Trantham did not help Williams develop her EEOC claims.

The court notes that, even to its untrained eye, the handwriting of Williams's first page of notes appears quite different from the handwriting in her second page of notes. *See* (doc. 214-28 at 6). But as stated before, Defendants must prove by "clear and convincing" evidence that (1) Trantham and Williams committed fraud and that (2) the fraud prevented Defendants "from fully and fairly presenting [their] case." *See Harre v. A.H. Robins Co., Inc.*, 750 F.2d 1501, 1503 (11th Cir. 1985) (citation omitted). The court will address each element in turn. And as stated before, the court will consider whether Defendants' lack of diligence before and at trial, rather than the alleged fraud, prevented Defendants from fully and fairly presenting their case. *Taylor*, 831 F.2d at 259; *In re Hope 7 Monroe Street Ltd. Part.*, 743 F.3d at 875.

### i. Evidence of Fraud

At trial, Defendants pressed the issue of Trantham's involvement with Williams's discrimination claims:

Q: And didn't [Ms. Trantham] also assist you . . . in putting together your EEOC claim?

A: No, sir.

Q: So it's your testimony here today that Ms. Trantham never did talk to you or assist you in any way about putting together your EEOC claim?

A: No, sir. I'm grown, I think I can handle that by myself.

Q: You're saying you did that by yourself?

A: Yes, sir.

(Doc. 228 at 69–70).

Because Defendants allege that Trantham wrote Williams's first page of notes concerning her allegations, Defendants argue that this testimony constitutes fraud under Rule 60(b)(3). As support, Defendants provide an analysis that they secured after trial from a handwriting expert who concluded that it was "highly probable" that Ms. Trantham wrote the first page of Williams's alleged notes. (Doc. 238-1 at 3).

The court will assess Defendants' sole evidence of perjury: the handwriting analyses. Defendants' motion originally relied only on an affidavit from their handwriting expert, dated July 27, 2021. (Doc. 214-28). That affidavit concludes that the first page of Williams's notes and Trantham's EEOC documents "were executed by a common writer." (*Id.* at 3). It further concludes that Williams's second page of notes was "written by someone other than the author of" the handwritten pages in Trantham's EEOC file and the first page of Williams's alleged notes. (*Id.*). But that affidavit provides no support for its conclusions, it

does not discuss the expert's credentials at length, and it does not discuss his methodology. So, the court finds that affidavit insufficient as expert testimony of fraud.

Perhaps recognizing this deficiency, Defendants later submitted a lengthier report from the same expert, dated February 17, 2022. (Doc. 238-1).[8] That document discusses the expert's testing methodology, provides peer-reviewed support for that methodology (including two articles that the expert co-authored), and substantiates the expert's credentials. In that document, the expert concludes:

> To the level of *highly probable*, it is concluded that the writer of the hand printed entries on [Williams's first page of notes and Trantham's EEOC file] were written by the same person.

> To the level of *highly probable*, it is concluded that the writer of the entries on [Williams's second page of notes] did not write the entries on [the other documents]. . . .

> The term "highly probable" . . . is defined as meaning that the examiner is "*virtually certain*" that the questioned writing and the submitted known specimens are of a common source. This conclusion reflects a very high level of confidence.

(Doc. 238-1 at 2–3) (emphases added). But the report notes: "The submitted exhibits were copies. The examination of original documents is preferred. . . . The examination of copies has inherent limitations to an examination." (*Id.* at 3).

_____

[8] Defendants submitted the handwriting expert report in a filing entitled "Defendants' Motion to Supplement the Newly Discovered Evidence Submitted by the Defendants in Support of their Motion for a New Trial." (Doc. 238). But that filing makes clear that its only purpose is to provide the report of their handwriting expert. (*Id.* at 1). The court construes that filing to be an evidentiary submission, rather than a motion. Although Williams opposes the evidentiary submission, the court denies Defendants' motion even when considering their evidence. So the court will not address Williams's opposition to the submission.

The court finds that this report does not provide clear and convincing evidence of fraud. For one thing, little case law supports the premise that handwriting analysis, standing alone, can provide clear and convincing proof of fraud under Rule 60(b)(3). In the most analogous case this court could locate, the First Circuit found that reports by *two* handwriting experts finding a likelihood of forged signatures did not provide clear and convincing evidence that the witness committed fraud when she testified that she signed the documents at issue. *Tiller v. Baghdady*, 294 F.3d 277, 282 (1st Cir. 2002). In that case, the experts compared the witness's signature on the documents at issue to her signature on a passport fifteen years later. The first expert concluded that the witness's earlier signatures "were not, in all probability, authored by" the witness. *Id.* The second expert agreed that it was "probable" that the signatures on the document at issue were forged. Even so, the Circuit Court found insufficient evidence of fraud because the experts noted that, "in order to be more conclusive," their analyses would need both original documents, rather than photocopies, and documents created in similar time frames. *Id.*

Although not directly analogous to this case, the analysis in *Tiller* indicates the steep burden of proof when a party attempts to support a fraud allegation with handwriting analysis. Unlike *Tiller*, Defendants provided the opinion of only one expert. And as in *Tiller*, Defendants' expert noted the weakness of relying on

copies for his analysis. (Doc. 238-1 at 3). The court notes that the copies that Defendants provided to their expert are extremely grainy and faded, despite clearer copies being available in the record. *Compare* (doc. 238-1 at 15 *et seq.*) *with* (doc. 214-16 at 28 *et seq.*). This court cannot comprehend how Defendants' expert purported to reach "virtually certain" conclusions based on these poor samples.

As stated before, the Eleventh Circuit has found fraud based on perjury allegations only when the witness directly undermines his previous testimony in later proceedings, *see Rembrandt Vision Tech., L.P.*, 818 F.3d at 1323, or when the movant provides documents that indisputably show perjury, *see Bonar*, 835 F.2d at 1385; *Harre*, 750 F.2d at 1503. Defendants' evidence does not meet this mark; neither Trantham nor Williams have contradicted their testimony in later proceedings. And although Defendants' expert concluded that it was "highly probable" that Trantham wrote the first page of Williams's notes, the court does not find this evidence to provide clear and convincing evidence of perjury, primarily because of the poor quality of the copies examined.

Finally, Ms. Williams and Ms. Trantham recently alerted the court that a state grand jury indicted them for perjury based on Defendants' perjury claims regarding their testimony in this case. (Doc. 232). Defendants have not presented these proceedings as evidence of perjury, nor would the court consider them as such. Courts have properly rejected mere *allegations* as insufficient proof of

40

perjury under Rule 60(b)(3). *See Harre v. A.H. Robbins Co.*, 866 F.2d 1303, 1304 (11th Cir. 1989) (vacating prior opinion finding fraud under Rule 60(b)(3) because allegedly fraudulent witness was acquitted of perjury charges in separate proceeding); *see also Philos Tech., Inc. v. Philos & D, Inc.*, 802 F.3d 905, 918 (7th Cir. 2015) (affirming denial of 60(b)(3) claim based on perjury conviction in foreign jurisdiction because conviction was later vacated).

In sum, the court finds no clear and convincing evidence of fraud based on the findings of Defendants' handwriting expert.

### ii. Whether Defendants Could Fully and Fairly Present Their Case

Ms. Williams argues that, even if fraud exists, it did not prevent Defendants from fully and fairly presenting their case because Defendants had ample opportunities to discover the alleged fraud sooner. (Doc. 221 at 24). The court agrees.

As stated before, the handwriting of Williams's first page of notes differs from the handwriting on the second page of notes. *See* (doc. 214-16 at 28–29). Williams produced these two pages of notes as part of her initial disclosures. And Defendants' main theory at trial was to challenge the veracity of Williams's discrimination claims and whether Trantham influenced those claims. So, the court cannot comprehend Defendants' failure to address the apparent handwriting disparity before trial. In other words, the court finds that Defendants failure to

41

investigate the fraud before trial or their own "tactical decisions, not fraud by [Plaintiff,] prevented [them] from fully presenting their case." *Waddell*, 329 F.2d at 1310 (citing *Taylor*).

And at trial, Defendants did no more than ask Ms. Williams cursory questions about the notes' authenticity for admissibility purposes: "I'll ask you to take a look at [the two pages of notes], if you would, and make sure that's your note. Are those your notes-- . . . A: Yes, these are mine." (Doc. 228 at 61). Defendants' failure to question Ms. Williams regarding the apparently disparate handwriting is particularly glaring because Defendants—not Ms. Williams— introduced the notes as an exhibit and only Defendants relied on the notes at trial. Nor did Defendants question the handwriting when the notes were introduced in Williams' deposition in May 2017. (Doc. 214-16 at 28). As in *Taylor*, Defendants "declined to cross examine" Williams about a key material fact; the court will not reward that inaction with a new trial. *See Taylor*, 831 F.2d at 259.

Likewise, Defendants failed to conduct a handwriting analysis until after trial, when Defendants received samples of Trantham's handwriting in response to their subpoena for Trantham's EEOC Questionnaire. Defendants blame this delay on Williams's alleged discovery misconduct regarding Trantham's EEOC file, but the court has already explained the weaknesses of that claim. Defendants also do not dispute Williams's claim that Defendants could have acquired samples of

42

Trantham's handwriting sooner by either subpoenaing the EEOC for Trantham's file earlier or by consulting the handwritten documents that Trantham produced while serving as the Lodge's manager. So Defendants bear the blame for not conducting a handwriting comparison that would uncover the alleged perjury sooner.

In sum, the court found in the previous section that Defendants failed to provide clear and convincing evidence of fraud based on their perjury allegations concerning Williams's notes. The court now also finds no clear and convincing evidence that the alleged fraud prevented Defendants from fairly and fully presenting their case. So, the court will deny Defendants' motion on these alternative grounds.

### III.   **Defendants' Claims for Remittitur**

Defendants argue that the jury erred in awarding Ms. Williams damages. As stated above, the jury awarded Ms. Williams the following damages:

- $3,570.00 for lost wages as to the retaliation claim;

- $200,000 in compensatory damages against both Defendants collectively for emotional pain and mental anguish as to the retaliation claim;

- $200,000 in punitive damages against Coxwell for the retaliation claim;

- $200,000 in punitive damages against Socoper, Inc. for the retaliation claim;

- $200,000 total in compensatory damages collectively against both Defendants for the state law claims of invasion of privacy and intentional infliction of emotional distress;

- $200,000 in punitive damages against Coxwell for the state law claims;

- And $200,000 in punitive damages against Socoper, Inc. for the state law claims.

(Doc. 194).

Defendants do not challenge the award of back pay. But as to all other damages awarded, Defendants request that the court remit or, alternatively, grant a new trial.[9] The court agrees in part and disagrees in part; so the court will discuss each category of damages below.

The Eleventh Circuit has stated: "The injury in civil rights cases may be intangible. . . . It need not be financial or physical but may include damages for humiliation and emotional distress." *Stallworth v. Shuler*, 777 F.2d 1431, 1435 (11th Cir. 1985). But courts should order a remittitur if the damages award "exceeds the maximum amount that could have been awarded based on the evidence and the instructions." *Rodriguez v. Farm Stores Grocery, Inc.*, 518 F.3d 1259, 1266 (11th Cir. 2008).

---

[9] Defendants' brief concerning the damages employs shifting terminology for the requested relief. *Compare* (Doc. 216 at 47, requesting that damages "be set aside or remitted as appropriate") *with* (*id.* at 49, requesting "a new trial, or as appropriate remit the Plaintiff's award"). The court construes the motion to request the typical relief in this area of law: an order for a new trial concerning damages unless the Plaintiff accepts a remittitur of the damages. *See Langford v. Hale Cnty. Ala. Comm'n*, No. 2:14-070-KD-M, 2016 Wl 5172887, *3 (S.D. Ala. Sept. 16, 2016) (citing *Goldstein v. Manhattan Indus., Inc.*, 758 F.2d 1435, 1448 (11th Cir. 1985)).

The Eleventh Circuit has also cautioned courts against "divining" the appropriate amount of damages when the party moving for remittitur fails to provide "a dollar amount that would not be excessive." *See Advanced Bodycare Solutions, LLC v. Thione Intern., Inc.*, 615 F.3d 1352, 1363 n.23 (11th Cir. 2010) ("Because [counterclaim defendant] did not indicate the amount of the remittitur or judgment reduction the district court should have ordered—put another way, since Advanced did not point the district court to a dollar amount that would not be excessive—it is unclear how the district court could have divined such amount."). Here, Defendants have not proposed an acceptable amount for any of the categories of damages that they challenge. So the court addresses Defendants' motion while bearing in mind the Eleventh Circuit's caution against divining an appropriate amount.

### a. *The Award of $200,000 in Compensatory Damages for Retaliation*

Defendants argue that the jury erred in awarding Ms. Williams $200,000 in compensatory damages for her retaliation claim. The jury verdict form indicates that these damages compensated Williams for "emotional pain and mental anguish" resulting from Defendants' retaliatory "decision to terminate her employment." (Doc. 194 at 1—2). In part, Defendants argue that Williams failed to prove what emotional distress she suffered "as a result of being fired." (*Id.* at 46). The court agrees.

45

The Eleventh Circuit has stated that compensatory damages "need not be proven with a high degree of specificity." *Akouri v. State of Fla. Dept. of Transp.*, 408 F.3d 1338, 1345 (11th Cir. 2005). In *Akouri*, the Eleventh Circuit affirmed the lower court's complete remittitur of $552,000 in compensatory damages for emotional distress in a Title VII case. The Circuit Court found that the plaintiff "failed to show *any* evidence regarding emotional distress." *Id.* at 1345 n.5 (emphasis in original). In general, courts must grant deference to a jury's award of compensatory damages for emotional harm because "the harm is subjective and evaluating it depends considerably on the demeanor of the witness." *Id.* at 1344. But the plaintiff in that case failed to show any damages "arising from the discrimination." *Id.* at 1345. In other words, "an award for emotional distress must be preceded by a finding of a sufficient *causal connection* between the defendant's illegal actions and the plaintiff's injury." *Gore v. Turner*, 563 F.3d 159, 164 (5th Cir. 1977) (emphasis added).

The court finds that Ms. Williams failed to show that she suffered emotional pain and mental anguish caused by Defendants' retaliatory firing. Below, the court will discuss Ms. Williams's testimony concerning her emotional distress flowing from Defendants' horrific acts of harassment and invasion of her privacy. But that evidence shows no "causal connection" between Defendants' *retaliatory firing* and her distress; that distress resulted from Defendants' harassment at work and

occurred before Defendants fired her. *See Gore*, 563 F.3d at 164. Williams provided no evidence of emotional distress caused by Defendants' firing, as opposed to their other harassing conduct. As in *Akouri*, the lack of any evidence as to damages "arising from the discrimination"—that is, the retaliatory firing—supports a complete remittitur of the jury's compensatory damages award for the retaliation claim. *See Akouri*, 408 F.3d at 1345.

The court finds that the jury's award of $200,000 to compensate for emotional pain and mental anguish under the retaliation claim "exceeds the maximum amount that could have been awarded based on the evidence and the instructions." *Rodriguez*, 518 F.3d at 1266. So, the court will order a new trial concerning damages unless Ms. Williams accepts a complete remittitur of that award.

### b. *The Award of $200,000 in Compensatory Damages for Invasion of Privacy and Outrage*

Defendants also challenge the $200,000 award that Ms. Williams received for "emotional pain and mental anguish" resulting from Defendants' invasion of her privacy and intentional infliction of emotional distress under state law. (Doc. 194 at 4). Defendants claim that Williams failed to show that she needed "medical treatment or counseling," that she suffered "sleepless nights" or "depression," or that her mental anguish "prevented her from carrying out her daily responsibilities." (Doc. 216 at 47). They also argue that Ms. Williams endured

47

Defendants' invasive conduct for a relatively short period of time—roughly two weeks.

In Alabama, "the amount of the jury's award is left to the jury's sound discretion, and the jury's award will not be set aside absent a clear abuse of discretion." *Kmart Corp. v. Kyles*, 723 So. 2d 572, 578 (Ala. 1998).[10] The plaintiff's evidence must show more "than the obvious notion that dealing with a traumatic event was 'hard' or 'humiliating.'" *Slack v. Stream*, 988 So. 2d 516, 532 (Ala. 2008).

The court finds that Ms. Williams presented sufficient evidence showing that she suffered emotional distress from Defendants' tortious conduct to support this award. For example, she testified that she feared for her safety because of Coxwell's threat that he would "take [her] home and tie [her] up in his basement." (Doc. 228 at 54). She testified as to the harassing conduct that she endured, including Coxwell's grabbing and "trying to grind on" her (*id.* at 53), his vulgar questions about her sex life (*id.* at 54), and his comments about her body parts (*id.* at 55). She stated that she felt nasty and that she began to dress more modestly to stave off those comments. (*Id.* at 55). She also endured comments about her race, including Coxwell calling her a "nigger" and an "old black bitch." (*Id.* at 56). He

---

[10] As a federal court reviewing a compensatory damages award on a state law claim, the court must examine the propriety of the award under Alabama law. *See Myers v. Cent. Fla. Invs., Inc.*, 592 F.3d 1201, 1212 (11th Cir. 2010).

accused her of "think[ing] like a nigger" when she adorned her natural hairstyle

rather than a blonde wig, and he repeatedly called her and other black employees

"stupid." (*Id.* at 56–57). She stated that these comments led her to change her

hairstyle and made her "feel ashamed to even be black." (*Id.* at 56, 59). The court

finds that this evidence amounts to much more than the mere assertion that dealing

with Defendants' conduct was "'hard' or 'humiliating.'" *See Slack*, 988 So. 2d at

532.

As to Defendants' challenge about the two-week period that Ms. Williams

endured this conduct, Defendants cross-examined Williams at trial about this very

point. (Doc. 228 at 64). Nothing indicates that the jury failed to take Williams's

testimony on that point into account; so, the court will defer to the "jury's sound

discretion" in awarding damages despite that argument. *See Kmart Corp.*, 723 So.

2d at 578.

Defendants also provide an unhelpful string cite to cases—some of which

are over 20 years old—in which the Alabama Supreme Court remitted damages

awarded for tort claims unrelated to the kind of torts in this case. (Doc. 216 at 49)

(citing, *e.g.*, *Oliver v. Towns*, 770 So. 2d 1059 (Ala. 2000) (remitting damages for

plaintiff claiming misappropriation of funds, who only testified that she suffered "a

lot" of mental anguish)). Defendants do not argue how their cited authority bears

on this case; so the court finds it to have little value here. As explained above, Ms.

Williams offered more than cursory testimony about her emotional distress caused by Defendants' reprehensible conduct.

Finally, the court takes issue with Defendants' callous characterization of Williams's trial testimony about the harms she endured as "garden variety complaints." (Doc. 216 at 48). As the court instructed, the jury found that she suffered conduct "so extreme in degree as to be regarded as atrocious and utterly intolerable in a civilized society." (Doc. 230 at 31); *see United States v. Lopez*, 649 F.3d 1222, 1237 (11th Cir. 2011) ("We presume that juries follow the instructions given to them."). The court agrees with the jury's assessment. And Defendants have not proposed "a dollar amount that would not be excessive." *See Advanced Bodycare Solutions, LLC*, 615 F.3d at 1363 n.23. So, the court will not remit Ms. Williams's compensatory damages for emotional distress under her state law claims or grant a new trial as to those damages.

### c. The Award of $200,000 in Punitive Damages for Each of Ms. Williams's Federal and State Law Claims

The jury awarded Ms. Williams $200,000 in punitive damages from Mr. Coxwell and $200,000 from Socoper, Inc. for her retaliation claim. (Doc. 230 at 30). And the jury awarded her $200,000 in punitive damages from Coxwell and $200,000 from Socoper, Inc. for her state law claims. (*Id.* at 31). Defendants challenge these awards as excessive in violation of due process under the authority

of *BMW of N. Am. v. Gore*, 517 U.S. 559 (1996).[11]

In *BMW*, the Supreme Court identified three factors indicating whether punitive damages awards are unconstitutional: (1) the "degree of reprehensibility" of the wrongdoing; (2) the "disparity between the harm or potential harm suffered" and the punitive damages award; and (3) the "difference between this [punitive] remedy and the civil penalties authorized or imposed in comparable cases." *BMW of N. Am., Inc.*, 517 U.S. at 575.

The Eleventh Circuit has stated that the "dominant consideration" under these factors is the degree of reprehensibility of the defendant's conduct. *Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1283 (11th Cir. 2008); *see also Harrelson v. R.J.*, 882 So. 2d 317, 323 (Ala. 2003) (adopting similar view). The Circuit Court identified five sub-factors indicating the reprehensibility of the defendants' conduct:

> (1) whether the harm caused was physical as opposed to economic;
> (2) whether the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; (3) whether the target of the conduct was financially vulnerable; (4) whether the conduct involved repeated actions or was an isolated incident; and (5) whether the harm was the result of intentional malice, trickery, or deceit, or mere accident.

---

[11] Defendants do not challenge punitive damages under Alabama's standards. *See Harrelson v. R.J.*, 882 So. 2d 317, 325 (Ala. 2003) (addressing *BMW* and identifying "seven factors for determining whether a jury's award of punitive damages is excessive" under Alabama law). The court will not make for them arguments that have been made but were not.

*Id.*

The court finds that Defendants have failed to prove that Ms. Williams's punitive damages award is constitutionally excessive. As to *BMW*'s first and dominant factor, the court already discussed Williams's testimony of Coxwell's repeated vulgar sexual and racist remarks. *See Goldsmith*, 513 F.3d at 1283 (assessing whether the "conduct involved repeated actions"). Williams also testified that Coxwell tried to "grab" and "grind" on her and her daughter—that is, the harm was "physical as opposed to economic." *See id*. And the jury heard testimony of racist remarks by other Socoper employees, including Donald Gilbert. (Doc. 228 at 56). Williams and others also testified that Socoper lacked formal policies, handbooks, or signage that could have curbed harassment. (*Id.* at 34, 51, 66). And as the court instructed, the jury found Defendants' conduct to be "intentional," "outrageous in character," and "extreme in degree." *Compare* (Doc. 194 at 3) *with Goldsmith*, 513 F.3d at 1283 (assessing whether the conduct "was the result of intentional malice"). The court finds that Defendants have not shown that Williams's evidence failed to prove a "high degree of reprehensibility" under the factors in *Goldsmith*.

As to *BMW*'s second factor, the court finds that the disparity between Williams's punitive damages and her compensatory damages is not excessive. Under this factor, courts may compare the ratio of the plaintiff's punitive damages

to the *total* compensatory damages awarded, including back pay and mental anguish awards across all of the plaintiff's claims. *See Goldsmith*, 513 F.3d at 1275 (comparing ratio of plaintiff's punitive damages to damages for emotional distress and back pay under retaliation and wrongful termination claims). After remittitur, Ms. Williams's compensatory damages across all her claims (including back pay) totals $203,570. Her punitive damages total $800,000; so the ratio of her punitive damages to compensatory damages is nearly 4 to 1. That ratio falls well within the range of similar claims in discrimination cases. *See Goldsmith*, 513 F.3d at 1284 (affirming punitive damages nine time greater than compensatory damages in Title VII case and collecting similar cases).

Also, the Eleventh Circuit has refused to pinpoint a ratio of punitive damages to compensatory damages that passes muster under *BMW*; rather, the Circuit Court has "upheld punitive damages awards that were greater than single-digit multipliers of compensatory damages when the awards of compensatory damages were, like [plaintiff]'s damages, relatively small and there was a substantial need for deterrence." *Goldsmith*, 513 F.3d at 1284. Here, the testimony of Hattie Williams and Polly Trantham confirmed that Coxwell and other Socoper employees engaged in sexist and racist conduct toward other employees as well. *See* (doc. 228 at 34; doc. 229 at 60). And Williams testified that she filed her suit so that the conduct she endured "doesn't happen to nobody else." (Doc. 228 at 59).

In other words, the jury's award functions to deter similar conduct toward employees. So the court finds that Defendants have failed to show that the punitive damages are excessive.

As to *BMW*'s third factor, Defendants provide no evidence that the punitive damages awarded here exceed those authorized by statute or imposed in similar cases. And as stated above, Defendants fail to suggest "a dollar amount that would not be excessive." *See Advanced Bodycare Solutions, LLC*, 615 F.3d at 1363 n.23.

So, the court finds no grounds for remitting or granting a new trial as to the jury's award of punitive damages for Williams's retaliation claim and state law claims.

## <u>CONCLUSION</u>

For the reasons stated above, the court will enter an order ruling as follows. The court will deny Defendants' motion for a new trial based on the court's evidentiary rulings because it finds those arguments to have no merit. The court will also deny Defendants' motion based on the alleged perjury by Ms. Williams and Ms. Trantham and the alleged discovery misconduct of Williams's counsel because of Defendants' failure to provide the required proof of fraud under Rule 60(b)(3).

But the court will grant in part Defendants' motion insofar as it challenges the damages award for emotional distress in Williams's retaliatory discharge claim.

The court will order a new trial as to damages for Ms. Williams's retaliation claim unless she accepts a complete remittitur of the $200,000 compensatory damages she received under that claim. But the court finds that the remaining damages awards are not excessive; so the court will not order remittitur of those damages. If Ms. Williams accepts the remittitur, she will be entitled to the following damages:

- $3,570.00 for lost wages as to the retaliation claim;

- $200,000 in punitive damages against Coxwell for the retaliation claim;

- $200,000 in punitive damages against Socoper, Inc. for the retaliation claim;

- $200,000 total in compensatory damages against both Defendants collectively for the state law claims of invasion of privacy and intentional infliction of emotional distress;

- $200,000 in punitive damages against Coxwell for the state law claims;

- And $200,000 in punitive damages against Socoper, Inc. for the state law claims.

**DONE** and **ORDERED** this 28th day of March, 2022.

_Karon O. Bowdre_
_____
**KARON OWEN BOWDRE**
UNITED STATES DISTRICT JUDGE