FILED

2026 Mar-31  AM 10:30
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

**POLLY DIANE TRANTHAM,**
    Plaintiff,

**v.**

**SOCOPER, INC.,** *et al,*
    Defendant.

**Case No. 1:16-cv-1476-CLM**

## <u>MEMORANDUM OPINION</u>

Polly Trantham sued James Coxwell and Socoper, Inc. for retaliation, invasion of privacy, and outrage. A jury found for Trantham on all three counts. (Doc. 357). Consistent with the jury's verdict, the court entered final judgment that awarded Trantham $25,295.50 for lost wages and benefits, a combined $1.2 million to compensate for Trantham's emotional pain and mental anguish, and a combined $2.4 million in punitive damages. (Doc. 358).

Defendants move for various forms of post-trial relief, including judgment as a matter of law under Rule 50(b), a new trial under Rule 59(a), and the remittitur of compensatory and punitive damages. (Doc. 371). For the reasons explained within, the court:

- **DENIES** Defendants' Rule 50(b) motion for judgment on Trantham's outrage claim;
- **DENIES** Defendants' Rule 50(b) motion for judgment on Trantham's claim for back pay;
- **DENIES** Defendants' Rule 50(b) motion for judgment on Trantham's claim for mental anguish and emotional distress damages;
- **DENIES** Defendants' Rule 59(a) motion for a new trial on all three counts;
- **GRANTS** Defendants' Rule 59(a) motion for a new trial on Trantham's claim for back pay;
- **DENIES** Defendants' Rule 59(a) motion for a new trial on Trantham's claim for mental anguish and emotional distress damages; and,
- **DENIES** Defendants' Rule 59(a) motion to reduce the jury's award of punitive damages.

## I.

## BACKGROUND

The jury found for Trantham on all counts. Because Defendants attack the verdict, the court recites the facts in a light most favorable to Trantham, including Coxwell's crass language.

### A. The facts

Polly Trantham and her late husband John ran a trucking business from 1998 until John's unexpected death in April 2013. Unable to continue the trucking business without John, Trantham sought work as a bookkeeper.

Socoper, Inc. owned the Long Leaf Lodge, a hotel that primarily served police academy cadets and military personnel on the site of the former military base Fort McClellan. Jim Coxwell owned Socoper, Inc. and served as its CEO and CFO. In January 2014, the lodge needed a bookkeeper, so Coxwell interviewed then hired Trantham.

This lawsuit stems from two series of events that occurred while Trantham worked for Coxwell at the lodge in 2014-2015: (1) Trantham complained to Coxwell several times that his mistreatment of black employees would hurt the lodge; and (2) Coxwell sexually harassed Trantham. The latter series traumatized Trantham; the former caused Coxwell to fire her.

### 1.  Retaliation for reporting racial misconduct

Trantham is white, as was Coxwell.[1] At trial, Trantham described five instances in which Coxwell either said or acted in a racist manner toward his black employees, and Trantham either called him out or acted against orders.

First was the firing of Steven Holt. As mentioned, Trantham started as the lodge's 20-hour per week bookkeeper. Holt (a black man) was the manager. One day in February or March 2014, a captain asked Coxwell why the lodge had not billed for his unit's stay. Coxwell determined that Holt had not billed the unit, costing the lodge money. So Coxwell fired Holt, calling him "stupid

---

[1] Coxwell died shortly before trial, and his daughter Cam Coxwell Shiflett is now the party defendant representing her father's estate. Coxwell testified at trial by deposition.

and ignorant" and telling him "to get his black ass off of his property." Trantham assumed Holt's duties as hotel manager, a job she maintained until Coxwell fired her the next year.

Second came the comments about the cleaning staff. One day, a guest complained to Trantham that his room had not been refreshed and that he caught two of the housekeepers lying on the bed watching television. Trantham reported the complaint to Coxwell, who called a meeting with Trantham and the two employees, both black women. Coxwell started the meeting by telling the women that "this is not the welfare office," knowing that both received rent assistance. Trantham left the meeting and later confronted Coxwell, telling him that if he didn't stop using racial comments around his black employees, someone would sue the hotel. Coxwell told Trantham that "it was his damn business and he could run it any fucking way he wanted." The women quit, and Trantham replaced them with more black females (one of whom, Laura Williams, became Trantham's co-plaintiff in this case).

Third came Coxwell's refusal to discipline Donnie Gilbert, Trantham's brother who performed maintenance for the lodge. Three black female employees complained to Trantham that Gilbert was following them around the lodge. When Trantham confronted Gilbert, Gilbert got mad and called them "three lying black bitches." So Trantham immediately went to the office to get a discipline slip to suspend Gilbert and possibly fire him. But Coxwell followed her back to the room, and after hearing what happened, stopped Trantham. Coxwell left with Gilbert, and Trantham overheard Coxwell tell Gilbert: "I believe you. They are just three lying niggers."

Fourth came the nepotism. Coxwell was a Jacksonville State alum. In June 2015, Coxwell's grandson was about to start his studies at JSU, and Coxwell wanted to turn the lodge over to the boy's mother, Cam Coxwell Shiflett, who was moving to the area with him. To help the transition, Coxwell told Trantham that he wanted her to stay on as bookkeeper, and he needed Trantham to fire the JSU student who worked the front desk, Gereka Ford, a black female. Trantham pushed back, telling Coxwell that he shouldn't fire Ford because she was knowledgeable and good at her job, while Coxwell's daughter knew nothing about it. Coxwell responded that he wasn't "going to place more value on some little nigger" than his own daughter. Coxwell also

3

told Trantham that he wasn't happy with Trantham's hiring choices. As Trantham recalled the conversation, Coxwell said, "he was sick and tired of me turning the lodge into a ghetto lodge and hiring nothing but hood rats."

Fifth came the final straw. Undaunted by Coxwell's complaint about hiring black employees, Trantham hired Jonoah Pressley. When Coxwell found out, he sat down next to Trantham, leaned his chair toward her, and said, "I had already warned you about hiring hood rats." Coxwell fired Trantham a few weeks later for insubordination (although Coxwell maintained that the insubordination was not related to Trantham's hiring practices).

### 2. Sexual harassment

At the same time, Coxwell was sexually harassing Trantham. But not at first. When Coxwell hired Trantham in January 2014, he knew that Trantham needed the job because her husband died the previous April and that Trantham couldn't keep the family business running. Their relationship started off as cordial, with Trantham describing Coxwell as "fatherly or grandfatherly."

The relationship stayed that way for a year. But things started to change when Coxwell became flirtatious in January 2015. Then Coxwell showed up uninvited to Trantham's house on Valentine's Day and asked Trantham to go out. Trantham declined, saying that she was his employee and wanted to keep it that way.

Coxwell became more aggressive and vulgar. For example, one day after a meeting with his lawyers, Coxwell told Trantham that he told his attorneys that "he was tired of going without pussy." Coxwell would also tell Trantham how many times he had to fold his penis after using the restroom. And Coxwell would hoist his leg on Trantham's desk, rub his groin, and ask rhetorically, "How big of an old boy do you think I am?"

Trantham told Coxwell that she was disgusted and repeatedly told him that she was not interested in a relationship. Coxwell told Trantham that she needed to consider that her "market value was not what it used to be" and that it would "be in her best interest to accommodate him."

Then came April 13th, the second anniversary of John Trantham's death. Trantham went to work but was depressed. Sometime mid-morning, Coxwell approached Trantham and told her, "A good sport's fucking would get you over your husband." Trantham walked out. But she told the jury that she stayed at the lodge because she was alone and needed the job to take care of herself.

That changed after Coxwell exposed himself. As manager, Trantham spent each Friday conducting the weekly inventory. One Friday in May, Trantham was in the back of the storage room when Coxwell entered, and the door closed behind him. Trantham knew it was Coxwell from the sound of his boots. But she kept working. When Trantham finally turned around, she saw Coxwell with his pants and underwear down to his ankles and his penis exposed, "smiling like he had just won the lottery ticket." Trantham left that Friday sickened, humiliated, degraded, and afraid for her future. When she returned Monday, she asked Coxwell "to extend me the grace to find another job." She offered to stay and train her replacement. Less than two months later, Coxwell fired Trantham.

## B. The lawsuit

After exhausting their remedies with the EEOC, Trantham and Laura Williams, a black female co-worker, sued Coxwell and Socoper, Inc. in September 2016. Thanks to Defendants' legal shenanigans[2], the court had to bifurcate the case and try Williams's case alone in June 2021. Williams prevailed, and the court entered a judgment that later settled on appeal.

Trantham brought six claims, three of which made it to trial. In Count II, Trantham raised a retaliation claim under 42 U.S.C. § 1981 against Socoper, Inc., alleging that Socoper fired her in retaliation for her opposition to Coxwell's racist employment practices. In Count IV, Trantham alleged that

---

[2] As the parties stipulated in the pretrial order (doc. 330, pp. 3-4), Defendants successfully asked the District Attorney's office to seek criminal charges against Trantham after she filed this lawsuit. In 2017, Defendants accused Trantham of stealing from the lodge. The case was twice presented to the grand jury before an indictment was issued. This pending charge prevented Trantham from trying her case with Williams in 2021. But she still testified. So in 2022, Defendants had Trantham and Williams arrested on perjury charges for lying during Williams' trial in this court, a perjury allegation this court later found that Defendants could not prove by clear and convincing evidence. All of the charges were nol prossed in 2024, thus delaying Trantham's day in court about 4-5 years. The court prevented the jury from hearing any of this. *See* (*id.*, p. 4) (pretrial order); (doc. 359, pp. 196-98) (trial transcript).

Defendants invaded her privacy, in violation of Alabama common law, when Coxwell pried into Trantham's sex life, pursued a sexual relationship with Trantham, made graphic sexual comments to Trantham, and exposed himself to Trantham. In Count V, Trantham alleged that Defendants committed the Alabama common-law tort of outrage based on the same facts that invaded her privacy in Count IV.

The jury found for Trantham on all three counts and awarded her these damages:

- § 1981 Retaliation: $25,295.50 for lost wages and benefits, $200,000.00 for emotional pain and mental anguish, and $400,000.00 in punitive damages.

- Invasion of Privacy: $400,000.00 for emotional pain and mental anguish and $800,000.00 in punitive damages.

- Outrage: $600,000.00 for emotional pain and mental anguish and $1,200,000.00 in punitive damages.

(Doc. 358) (final judgment). Defendants timely moved for relief under Rules 50(b) and 59(a). (Doc. 371). The court details Defendants' requests in its Discussion section, Part III. But first, the court cites the standards of review.

## II.

## STANDARDS OF REVIEW

### A. Rule 50(b), motion for judgment

Rule 50(b) provides:

If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. No later than 28 days after the entry of judgment—or if the motion addresses a jury issue not decided by a verdict, no later than 28 days after the jury was discharged—the movant may file a renewed motion for judgment

> as a matter of law and may include an alternative or joint request for a new trial under Rule 59. In ruling on the renewed motion, the court may:
>
> (1) allow judgment on the verdict, if the jury returned a verdict;
>
> (2) order a new trial; or
>
> (3) direct the entry of judgment as a matter of law.

When considering a motion for judgment as a matter of law under Rule 50(b)(3), the court views the evidence and draws all reasonable inferences in the light most favorable to the nonmoving party. *See Hubbard v. BankAtlantic Bancorp, Inc.*, 688 F.3d 713, 724 (11th Cir. 2012). Judgment as a matter of law is appropriate if "a reasonable jury would not have a legally sufficient evidentiary basis to find for the" nonmoving party. Fed. R. Civ. P. 50(a). "Only the sufficiency of the evidence matters; what the jury actually found is irrelevant." *Hubbard*, 688 F.3d at 724.

## B. Rule 59(a), motion for a new trial

Rule 59(a)(1) provides:

> (1) GROUNDS FOR NEW TRIAL. The court may, on motion, grant a new trial on all or some of the issues—and to any party—as follows:
>
> (A) after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court; or
>
> (B) after a nonjury trial, for any reason for which a rehearing has heretofore been granted in a suit in equity in federal court.

The court "should grant a motion for a new trial when the verdict is against the clear weight of evidence or will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." *Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1186 (11th Cir. 2001) (quotations omitted).

7

## III.

## DISCUSSION

The court addresses Defendants' arguments in the order they made them below, starting with the arguments for judgment as a matter of law.

### A. Rule 50(b) Arguments

### 1. Tort of outrage (Rule 50(b))

While Defendants argue that the jury got the awards wrong, they contest the jury's merits verdict on only one of the three counts: state-law outrage. Defendants admit that Trantham submitted enough evidence to show that Coxwell sexually harassed Trantham, but they contend the evidence does not clear Alabama law's high bar that the harassment be "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Am. Rd. Serv. Co. v. Inmon*, 394 So. 2d 361, 365 (Ala. 1981).

The court tackles this argument in three parts. First, it reviews state court decisions that divide sexual harassment claims between the boorish and the truly outrageous. Second, the court decides whether Defendants are right that touching is needed to make sexual harassment outrageous under Alabama law. Third, the court puts it all together to decide whether Trantham's evidence clears the high state-law standard.

In the end, the court finds that there is no bright-line rule for finding outrage, other than Alabama's repeated application of the Second Restatement's requirement that an average person deem the act so outrageous and extreme to be intolerable in a civilized society. *Id.* Alabama society has deemed exposing oneself to a co-worker for self-satisfaction so atrocious and utterly intolerable that Alabama made it a crime punishable by up to one year in prison. *See* Ala. Code § 13A-6-68. If the People have decided that law enforcement may remove from society a person who acted like Coxwell because his conduct was utterly intolerable, then how can this federal court say that an average juror would not find Coxwell's behavior utterly intolerable?

8

### a. Common law outrage

1. *General standard*: Alabama does not provide a statutory claim for sexual harassment. So Alabama looks to common law. *See Machen v. Childersburg Bancorporation, Inc.*, 761 So. 2d 981, 983 n.1 (Ala. 1999); 1 Michael L. Roberts, *Alabama Tort Law*, § 23.02 (8th ed. 2025).

Relevant here, Alabama adopted the tort of outrage and cited § 46 of the Second Restatement of Torts for the test: "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." *Inmon*, 394 So. 2d at 362, 365. That said, the court was worried that adopting the tort could create trivial lawsuits, so the court also embraced the Second Restatement's limitation: "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities" are not actionable. *Id.* at 364–65. (quoting § 46's comment section). And again pulling from the Second Restatement's comment sections, the court set a high bar for both the defendant's conduct and the plaintiff's injury:

- Defendant's conduct: "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society."

- Plaintiff's injury: emotional distress "so severe that no reasonable person could be expected to endure it."

*Id.* Alabama courts have applied these standards to sexual harassment claims since at least 1986. *See McIsaac v. WZEW-FM Corp.*, 495 So. 2d 649 (Ala. 1986). From 1986 to 1998, the state supreme court issued five opinions that shape the federal courts' understanding of the state common law standard.

2. *Example cases*: First came *McIssac v. WZEW-FM*. Plaintiff McIsaac worked for a radio station owned by Defendant Oppenheimer. Oppenheimer told McIssac that he wanted to have an affair and asked her to dinner. She declined. He then tried to kiss her. She declined. Three weeks later, Oppenheimer tried again, and McIsaac declined again. During these encounters, Oppenheimer gave McIsaac suggestive looks. The state supreme

court affirmed the granting of summary judgment for Defendants, finding that "[t]here is no evidence of severe emotional distress." *Id.* at 651. At most, the court said, Oppenheimer's conduct extended to "'mere insults, indignities, threats [or] annoyances,' for which the law will not hold one liable in tort. Restatement (Second) of Torts § 46, Comment d., (1965)." *Id.*

*Harris v. McDavid*, 553 So. 2d 567 (Ala. 1989) was similar, except the plaintiff agreed to the proposition. Plaintiff Harris worked with Defendant McDavid, who convinced her to have an affair and move to Birmingham with the promise of marriage. Then, after Harris conceived, McDavid called off the affair and the duo's business relationship to reconcile with his wife. The supreme court cited *McIsaac* to hold that McDavid's act of asking Harris to have an affair was not actionable outrage. *Id.* at 570. The court went on to hold that ending the personal and business relationship was also not outrageous because McDavid was exercising his legal right to save his marriage. *Id.*

The court reached a similar result on similar facts in *Perkins v. Dean*, 570 So. 2d 1217 (Ala. 1990). Defendant Dean was a social worker. He started counseling the Perkins (husband and wife) after their daughter committed suicide. During a private session, Ms. Perkins told Dean that she wanted to have an affair with him. Dean declined at the time but said to "check back with me" after Dean left his employment. Dean later left his job and had an affair with Ms. Perkins that lasted nine months. The Perkins sued Dean for outrage. Following *McIsaac* and *Harris*, the court again affirmed summary judgment, finding that requesting or consummating extra-marital affairs is not enough to prove a viable outrage claim.

The court first suggested an actionable set of facts in *Busby v. Truswal Sys., Corp.*, 551 So. 2d 322 (Ala. 1989). There, four women alleged that their supervisor Deaton:

- Invited two of them to swim in the pool naked;

- Asked one if he could put his hands in her pocket to keep them warm;

- Told them that he would put a stick on their machines so they could masturbate while working;

- Told them that he could have sex as fast as one of the company machines;

- Said that he wished they would come to work braless and wear less clothing;

- Told one that, if she gave him 30 minutes, he could get her pregnant;

- Acted like he would pinch their breasts with pliers or his hands;

- Asked one to hold his penis while he urinated;

- Told one that her nipples were as large as another's breasts;

- Openly stared at their sexual anatomy; and,

- Put his arm around them, grabbed their arms, and stroked their necks.

*Id.* at 324. After reciting the standard it adopted in *Inmon,* the supreme court said the women's testimonies "present[ed] enough evidence from which a jury could reasonably determine that Deaton's conduct rose to this level." *Id.* But Deaton had since died, so the court did not have an outrage claim against him before it. *Id.* Instead, the court focused on the claim against the employer, Truswal Systems. The court affirmed summary judgment for Truswal because, even assuming Deaton's conduct was outrageous, Truswal had no notice of it and Deaton's acts did not further the company's business. *Id.* at 326-27.

The court then found an actionable set of facts against the harasser and the employer in *Henry v. Georgia-Pacific Corp.*, 730 So. 2d 119 (Ala. 1998). Plaintiff Henry worked for Georgia-Pacific, and like all of her co-workers, was required to attend one-on-one counseling sessions with Defendant Dr. Deeble. During one session in which Dr. Deeble purported to hypnotize Henry to help her stop smoking, Dr. Deeble asked Henry if she could orgasm with her husband and told Henry that she was "getting horny." *Id.* at 120. Henry reported the talk about orgasms to her supervisor, who required her to keep seeing Dr. Deeble. Because she feared losing her job, she did. But she took a tape recorder and recorded Dr. Deeble asking her to take her shirt off. Her supervisor again required follow-up visits, which continued until Dr. Deeble stopped visiting the facility. The trial court granted summary judgment for Georgia Pacific and the supervisor (not Dr. Deeble). The supreme court

reversed, finding that not only was Dr. Deeble's conduct outrageous, but that Henry's supervisor and employer may also have acted outrageously because they knew about the conduct and required it to continue. *Id.* at 121.

3. *Takeaways*: A few things stand out about these decisions. First, when the supreme court rejected a claim of outrage in *McIsaac*, *Harris*, and *Perkins*, and when it accepted the claim in *Busby*, the court cited the standard set out in § 46 of the Second Restatement of Torts.

Second, in three cases of rejection (*McIsaac*, *Harris*, and *Perkins*), the court consistently said that making lewd comments and asking someone to have an affair, even in a work environment, is not enough to constitute outrage. That's true whether or not the affair is unwanted or consummated.

Third, in the cases where the court found actionable outrage (*Busby* and *Henry*), the sexual harassment occurred over a period of time, and the court looked at the totality of the bad actor's deeds, not just one act like physical touching (more on that later).

Fourth, even if the sexual harassment rose to the level needed for the tort of outrage, the employer is not liable for outrage unless the harassment (a) was within the scope of employment, (b) furthered the company's business, or (c) the company participated in, authorized, or ratified the harassment. *Busby*, 551 So. 2d at 326. The company cannot be liable if it neither knew about the harassment nor benefited from it.

Fifth and finally, the state supreme court hasn't meaningfully weighed in on this topic in over 20 years. That's likely because modern plaintiffs file their state-law tort of outrage claims in federal court as supplements to their federal statutory claims, as Trantham did here. *See* Roberts, *Alabama Tort Law*, § 23.02 (collecting state and federal cases). That means federal courts are trying to decide how Alabama courts would judge what level of harassment society would tolerate in the 2020s based on how that court viewed sexual harassment in the 1980s and 1990s. *But see Reg'l Prime Television v. S.*, 399 So. 3d 220 (Ala. 2024) (expanding the tort of outrage to include a claim against a streaming channel and its owner, who aired a show, *Ghostly Encounters*, that falsely attributed acts and statements to the plaintiff's deceased husband).

12

In sum, state court divination is an art, not a science. Neither the Alabama courts nor the Second Restatement have articulated a bright line that sexual harassment cannot cross. Instead, we have been given this 'you'll know it when you see it' standard: "Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" Restatement (Second) of Torts § 46, Comment d.

### B. Physical touching as the bright line

Defendants nevertheless read a bright line into these Alabama cases: There must be physical touching to constitute the tort of outrage. But knowing that *Henry* (the hypnosis case) had no physical touching, Defendants add an exception to their bright-line rule: If there was no physical touching, there can still be outrage if the plaintiff's job was *overtly* threatened with termination. To convince the court to hold this line, Defendants cite the court's own opinion back to it: "As this Court has previously noted when construing an outrage claim, 'principles of federalism dictate this court not expand the current bounds of state law.'" *Moore v. Lowe*, 591 F. Supp. 3d 1087, 1118 (N.D. Ala. 2022) (Maze, J.)." (Doc. 371, p. 24). The court takes the points in reverse order.

1. *Federalism*: Defendants are right; I have said that I would not expand the bounds of Alabama's tort of outrage. And I meant it. But Defendants omit the context in which I said it in *Moore* (and elsewhere)—*i.e.*, expansion of the *categories* of cases that may constitute outrage.

Traditionally, Alabama limited the tort of outrage to three categories:

> The tort of outrage is an extremely limited cause of action. It is so limited that this Court has recognized it in regard to only three kinds of conduct: (1) wrongful conduct in the family-burial context, *Whitt v. Hulsey*, 519 So. 2d 901 (Ala. 1987); (2) barbaric methods employed to coerce an insurance settlement, *National Sec. Fire & Cas. Co. v. Bowen*, 447 So. 2d 133 (Ala. 1983); and (3) egregious sexual harassment, *Busby v. Truswal Sys. Corp.*, 551 So. 2d 322 (Ala. 1989).

*Regional Prime,* 399 So. 3d at 246-47 (quoting *Potts v. Hayes,* 771 So. 2d 462,

465 (Ala. 2000)). But in recent years, the state's high court has found facts outside the three traditional categories that could also state a viable claim of outrage. *See Regional Prime Television*, *supra*,; *Wilson v. Univ. of Alabama Health Serv. Found., P.C.*, 266 So. 3d 674, 676-77 (Ala. 2017) (reversing the trial court's ruling that plaintiff could not state a claim of outrage made by doctors about her mother's pending death because it fell outside one of the three traditional categories).

My point in *Moore* and elsewhere was that the decision to *expand* the available categories should be left to state courts, as arbiters of state common law, until they expressly discard the category system. It is not for federal courts to expand the categories. But that concern is not present here. "[E]gregious sexual harassment" is one of the three traditional categories. *Potts*, 771 So. 2d at 465. So this court would not be expanding the available categories of outrage claims if it affirmed the jury's verdict; it would simply be deciding that Trantham's evidence fit within a category firmly established in state law.

2. *Touching as cornerstone*: Defendants' 'touching' theory of viability fails mainly because the state supreme court has never said it—or even hinted at it. Yes, touching was alleged in *Busby*, but so were **16** other discrete acts that did not involve touching, ranging from Deaton telling female subordinates that he can have sex faster than the company machines to asking female subordinates to swim nude with him to asking a female subordinate to hold his penis while he urinated. The supreme court never said that touching the women's arms and stroking their necks was the final straw, or even necessary, to cross the line into outrageous territory. The court never mentioned the touching beyond saying that it happened, alongside 16 acts of non-touching.

And as Defendants note, the supreme court allowed an outrage claim in *Henry* without touching. The court never mentioned the lack of touching as a problem with Henry's case, nor did it highlight the threat of her termination as the saving grace of her claim against the harasser, Dr. Deeble. Nor could the threat of termination matter to the court's finding that Dr. Deeble's acts were sufficiently outrageous because Dr. Deeble didn't make those threats; Henry's supervisor (Hurst) did. *Henry*, 730 So. 2d at 120. The court mentioned the termination threats not to prove what made Dr. Deeble's acts outrageous, but because they were necessary to make Henry's employer, Georgia-Pacific,

14

liable for the outrageous (non-touching) acts of Dr. Deeble.

In fact, touching cannot be the deciding factor under Alabama law when you remember that the supreme court rejected the outrage claims in *Harris* and *Perkins* even though both cases culminated in sexual relationships—*i.e.*, an ongoing series of physical touching between the plaintiff and defendant.

In short, Defendants try to create a bright-line rule with an exception where no bright line exists. To the extent that some of my federal colleagues have done the same by requiring touching, *see* (doc. 371, p. 34) (citing cases), I respectfully disagree. While I understand the urge to create a bright line rule to follow in sexual harassment cases, as explained, the state court hasn't adopted one. Instead, they've applied this Restatement rule every time:

> Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

Restatement (Second) of Torts §46, comment d, cited by *Inmon*, 394 So. 2d at 365, and applied in *McIsaac*, 495 So. 2d at 651; *Busby*, 551 So. 2d at 324; *Harris*, 553 So. 2d at 570; and *Perkins*, 570 So. 2d at 1219.

To create and apply any other test for outrage would be to usurp the state court's authority over its own common law, in violation of the principles of federalism Defendants ask the court to maintain. Further, it would prevent federal courts from deciding cases that involve a fact scenario never presented to the state court, such as a supervisor exposing his penis, behind closed doors, to a female subordinate who had rebuffed his advances multiple times.

## C. Application to Trantham's evidence

The court finds that Coxwell's acts leading up to April 13, 2015, would not constitute the tort of outrage under Alabama law. While a juror might find some of the acts before April 13th disgusting, particularly Coxwell hoisting his

leg on Trantham's desk, rubbing his groin, and asking rhetorically, "How big of an old boy do you think I am?" and telling Trantham how many times he had to fold his penis after using the restroom, such lewd comments might be deemed "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Inmon*, 394 So. 2d at 365 (quoting Restatement (Second) of Torts § 46, comment d)). The same could be said of Coxwell telling Trantham that she needed to reconsider her market value. *See* Restatement (Second) of Torts § 46, comment d. ("The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind.").

But Coxwell crossed the rhetorical line on April 13, 2015, the second anniversary of the death of John Trantham. Trantham had said she did not want a relationship with Coxwell for at least two months. Yet Coxwell knew that morning that Trantham was distraught about John's death, and he used that knowledge to proposition: "A good sport's fucking would get you over your husband." Section 46 of the Second Restatement says:

> The extreme and outrageous character of the conduct may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity. The conduct may become heartless, flagrant, and outrageous when the actor proceeds in the face of such knowledge, where it would not be so if he did not know. It must be emphasized again, however, that major outrage is essential to the tort; and the mere fact that the actor knows that the other will regard the conduct as insulting, or will have his feelings hurt, is not enough.

*Id.*, comment f. (highlighting added). Coxwell's statement meets this standard: Coxwell knew that Trantham was "peculiarly susceptible to emotional distress" on April 13, and he "proceeded in the face of such knowledge" to say something utterly "heartless, flagrant, and outrageous." *Id.* Because the Supreme Court of Alabama has consistently looked to § 46 of the Second Restatement when setting the boundaries of outrage claims, the court finds

that Coxwell's April 13th comment, when added to the prior acts and comments that came before, supports a finding of state-law outrage. The court's only hesitation in a full-throated endorsement is that the supreme court declined to find outrage in *Perkins*, where one might argue that Dean (the counselor) used his knowledge of Ms. Perkins' struggle with her daughter's death and her marriage to start an affair. But *Perkins* has one major fact twist: Unlike Trantham, who repeatedly rebuffed Coxwell, Ms. Perkins initiated the talk of an affair with Dean.

In any event, the court needn't base its decision solely on April 13th because Coxwell's later act of exposing himself carries his series of bad acts well over the line. Again, the test is whether Coxwell's acts were "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Inmon*, 394 So. 2d at 365. Evidence supports that Trantham had repeatedly rebuffed Coxwell's advances, including his allusions to penis size. So Coxwell waited until Trantham was alone in a supply room with no camera coverage, then came up behind her and exposed himself "smiling like he had just won the lottery ticket." An average person would deem such behavior by a supervisor toward his female subordinate to "go beyond all possible bounds of decency," especially if you told the average person how many times Trantham already said no, and that Coxwell knew that Trantham was still grieving her husband's loss. *Id*. On top of that, Alabama makes it a crime to expose your genitals to another person to arouse your own desire and levies punishment of up to one year in prison for that crime, *see* Ala. Code § 13A-6-68, thus giving the court a great indication that Alabamians deem such conduct so "atrocious and utterly intolerable" that you could be removed from society for doing it. In any event, it's clear that Alabama society deems exposing one's penis to a subordinate to be less tolerable than touching that subordinate's shoulder or hair—acts that Defendants argue *would* amount to actionable outrage.

—

The Second Restatement suggests a simple test: "Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!" Restatement (Second) of Torts, § 46 comment d. If an average

17

Alabamian read pages 4-5 of this opinion, that person would resent Coxwell and exclaim that his conduct was "outrageous!" The court therefore **DENIES** Defendants' motion for judgment against Trantham's claim of outrage.

### 2. Back pay

Defendants next ask the court to set aside the jury's award of $25,295.50 for lost wages and benefits, primarily they say, because Trantham failed to provide detailed testimony or documentary evidence about temp jobs that she worked after she was fired from the lodge.[3]

Trantham prevailed on her retaliation claim, so she was entitled to back pay. Back pay here is the difference between (a) the wages Trantham would have received if Socoper, Inc. had not retaliated against her and (b) the wages Trantham actually earned. *See Akouri v. State of Fla. Dep't of Transp.*, 408 F.3d 1338, 1343 (11th Cir. 2005); *see also* 11th Cir. Pattern Jury Instruction 4.5 (defining back pay as "net lost wages and benefits from the date of" the adverse employment action to the date of the verdict).

The parties prove and disprove both figures under shifting burdens. First, the plaintiff must prove the amount of wages and benefits she would have received but for the retaliation. If she does, then the defendant has the burden to produce other evidence of the amount of wages the plaintiff made or should have made with due diligence. *See Nord v. U.S. Steel Corp.*, 758 F.2d 1462, 1470–71 (11th Cir. 1985) (applying this burden shifting rule in Title VII cases); *Marks v. Prattco, Inc.*, 633 F.2d 1122, 1125 (5th Cir. Jan. 1981) (noting the same burden allocation applies in § 1981 cases). The court looks at both parties' burdens, in that order.

### A. Gross Backpay (money lost)

Again, the jury awarded $25,295.50 in back pay. The jury got this number from a graphic Trantham's attorney used during closing arguments. The court circles the final number to show that it matches the jury's verdict:

---

[3] Back pay is equitable, so the parties had no right to a jury on this issue. *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1184 (11th Cir. 2010). That said, the parties consented to having the jury decide back pay along with other fact issues, so the jury's verdict has full effect, *see* Fed. R. Civ. P. 39(c)(2), if the court finds no error under Rule 50(b) or Rule 59(a).



(Doc. 377, p. 13) (red circle added). The equation presents two figures: Gross Backpay (wages lost) minus Interim Earnings (wages gained). The court looks at both figures, in that order.

While the evidence suggested Trantham missed more than one year of work, she sought only one year of back pay. The parties stipulated that Trantham's final rate of pay at the lodge was $14.75 per hour. (Doc. 361, p. 119, line 6). Joint Exhibit 5 showed that Trantham worked an average of 42.1 hours a week during her last five weeks at the lodge. (Doc. 356-8). Because Trantham was an hourly employee, Trantham's attorney inferred that Trantham would be paid time and a half for any overtime. At a straight rate of $14.75 per hour, she thus calculated that Trantham's overtime rate would be $22.12 per hour. With those numbers, here's how Trantham's attorney calculated Trantham's weekly rate:

| | |
|---|---|
| 40 non-overtime hours x $14.75 = | $ 590.00 |
| 2.1 overtime hours x. $22.12 = | $ 46.452. |
| Total weekly earnings = | $ 636.45 |

Multiplying this weekly number of $636.45 times 52 weeks showed a one-year loss of $33,095.50.

The court finds that no evidence supports a finding that Trantham was paid time and a half for overtime hours. While that's a common practice, Trantham did not testify that she was paid extra for overtime work, and the parties did not stipulate to this fact. So the court must find that the "Gross Backpay" number is not supported and is thus inflated.

Multiplying the stipulated standard rate of $14.75 to Exhibit 5's evidence that Trantham worked 42.1 hours per week amounts to $620.975 of lost income per week. Assuming Trantham is correct that she worked every week of the year, multiplying this weekly amount times 52 weeks gives a Gross Backpay total of $32,290.70. The court finds that this amount, while likely inexact, is supported by the trial evidence. *See Akouri*, 408 F.3d at 1343 (in calculating a plaintiff's back pay, "[u]nrealistic exactitude is not required"; instead, "the back-pay calculation may be based on just and reasonable inference of the missing or imprecise figure") (quotations omitted).

### B. Interim earnings

From this Gross Backpay amount, Trantham subtracted $7,800 in Interim Earnings that reflected money Trantham earned doing temp jobs during the year in question. Trantham's attorney came to this number based on Trantham working temp jobs 2-3 days per week at a $7.50 minimum wage. Assuming 20 hours per week multiplied by $7.50, Trantham calculated that she made on average $150 per week. She then multiplied this weekly number by 52 to show annual interim earnings of $7,800.

Defendants rightly point out that much of this math relies on numbers not in evidence. Trantham never testified about how often she worked her temp jobs, when she first started working these temp jobs, the hours she worked at these jobs, or her rate of pay. Instead, Trantham's testimony about these temp jobs was that (a) it took her a little bit to find other employment, (b) she worked some sporadic jobs through the temp agencies, and (c) after the first deposition in this case, the agencies stopped sending Trantham out for jobs. (Doc. 359-1, p. 140, lines 3–8; pp. 182:23-183:6). Trantham's last temp job was with RHMC; she worked there around four months but couldn't remember what four months. (Doc. 359-1, pp. 186:20-187:12).

But Trantham's lack of evidence on interim wages doesn't help Defendants because, if the court threw out Trantham's calculation of interim earnings, Defendants' liability would go up, not down. Again, the court found that Trantham sufficiently proved her affirmative case of gross wages lost. If Defendants believed that Trantham failed to sufficiently prove *their* mitigation case because Trantham worked more hours, or was paid higher hourly wages, than Trantham acknowledged, then it was Defendants' burden to prove it. *See Nord* 758 F.2d at 1470–71; *Marks*, 633 F.2d at 1125. If anything, Trantham and her attorney did Defendants a favor by volunteering a number to be subtracted from the Gross Backpay amount that they sufficiently proved. The court cannot (and will not) throw out the entire award simply because neither party proved a definite mitigation number.

—

In short, the court finds that the evidence supported a Gross Backpay loss of $32,290.70, not the $33,095.50 number that Trantham argued to the jury, thus reducing the net loss to $24,490.70. The court **ORDERS** Trantham to choose either (a) to accept a remitted award of $24,490.70 or (b) re-try back pay damages.

### 3. Damages for Emotional Pain and Mental Anguish

Defendants next argue Trantham failed to present evidence that supports the jury's award on emotional pain and mental anguish. The court denies their motion for judgment on these damages for two reasons.

### A. Waiver

Rule 50(b) motions are renewals of Rule 50(a) motions made during trial. As such, "any renewal of a motion for judgment as a matter of law under Rule 50(b) must be based upon the same grounds as the original request for judgment as a matter of law made under Rule 50(a) at the close of evidence and prior to the case being submitted to the jury." *Doe v. Celebrity Cruises, Inc.*, 394 F.3d 891, 903 (11th Cir. 2004).

After Trantham rested, Defendants moved for judgment on the merits of all three claims but did not mention compensatory damages. (Doc. 360, pp. 62-

68). Later, when Defendants moved for judgment against Trantham's claims for compensatory damages after resting their case, they limited the Rule 50(a) motion to back pay and expressly excluded emotional pain and mental anguish:

> MR. SAXON:  And we were -- I was going to make the argument, Your Honor, as a judgment as a matter of law.  There has been no evidence from which this jury can conclude any compensatory damages are due. We had two bits of evidence elicited from Ms. Trantham.  One -- and I wrote down that she said she made 14.85.
>
> THE COURT:  Well, you are talking about compensatory on back pay.
>
> MR. SAXON:  Yes, sir.
>
> THE COURT:  Because she can prove emotional pain and mental anguish.
>
> MR. SAXON:  Yes, sir.  I am not talking about those damages.
>
> THE COURT:  Very good.  Back pay.  Got it.

(Doc. 361, pp. 108-09) (highlighting added). The court and parties then discussed how Trantham's attorney would calculate back pay from the evidence—*i.e.*, the calculation the court explained in the previous section. When the discussion concluded, Defendants reiterated the bases of their Rule 50(a) motion, and the court again clarified that the motion seeking judgment on compensatory damages would be limited to back pay:

> MR. SAXON:  Just for the record, at the close now of the defendant's case, we would move for judgment as a matter of law on all three of the plaintiffs's claims.
>
> THE COURT:  Very good.  Your objection, or your motion to have a directed verdict on all three, is preserved. And again, I will present all three to the jury.  We will see what the jury does. And if it is an adverse verdict, you can certainly reraise it, and I will have to make a decision one way or the other at that time.

> MR. SAXON:  Thank you, Your Honor.
>
> THE COURT:  And the same is true of your argument regarding the compensatory damage of back pay. All right. Anything else?
>
> MS. LEONARD:  Not from the plaintiff, Your Honor.
>
> THE COURT:  Anything?
>
> MR. SAXON:  Nothing from the defendant, Your Honor.

(*Id.*, pp. 111-12). Defendants never moved for judgment against Trantham's request for mental anguish and emotional distress damages under Rule 50(a), so they cannot do so now in a Rule 50(b) motion. *Doe*, 394 F.3d at 903.

The court could stop here. But it goes on to explain why, even if Defendants preserved a motion against Trantham's request for mental anguish and emotional distress damages, the court would deny it. The court splits its discussion into two parts because Trantham was injured by distinct torts: retaliation and sexual harassment.

### B. Sufficient evidence: Retaliation

Defendants argue that Trantham's only evidence of mental anguish was her personal testimony; she offered no medical records or physician/counselor testimony to back it up. But as Defendants acknowledge, the Eleventh Circuit has said that "a plaintiff's testimony, standing alone, can support an award of compensatory damages for emotional distress," as long as the testimony "establish[es] that the plaintiff suffered demonstrable emotional distress, which must be sufficiently articulated." *Akouri*, 408 F.3d at 1345. "[N]either conclusory statements that the plaintiff suffered emotional distress nor the mere fact that a . . . violation occurred supports an award for compensatory damages." *Id.*

The court finds that Trantham sufficiently articulated demonstrable emotional distress linked to her firing (*i.e.*, Coxwell's race-based retaliation). Trantham testified about her anger when she was fired:

23

> Q. After Mr. Coxwell terminated you, were you mad at him?
>
> A. I think it was a combination of some anger but mainly hurt because I had worked really hard for him. I had worked seven days a week. I was on call 24 hours a day. Not even housekeeping was on call 24 hours a day. Not even maintenance was on call 24 hours a day. I worked every holiday, every holiday so the other employees could be with their families because I didn't have any family.

(Doc. 359, pp. 142-43). Gereka Ford, Donnie Gilbert, and Edwin Williams all confirmed that Coxwell's firing upset Trantham. *See* (doc. 360, p. 178) (Gilbert); (doc. 361, p. 21) (Ford); (doc. 361, p. 50) (Williams).

Trantham also testified that Coxwell's retaliation "took away my ability to go to work . . . minus the few times that I have managed to pick up a job short term." (Doc. 359, p. 146). As mentioned, Trantham needed to work because her husband recently died, leaving Trantham to fend for herself.

Compensatory damages "need not be proven with a high degree of specificity." *Akouri*, 408 F.3d at 1345. And in general, this court's review of a jury's award "for intangible, emotional harm is deferential to the fact finder because the harm is subjective and evaluating it depends considerably on the demeanor of the witnesses." *See id.* at 1344. The court finds that the testimony mentioned above is sufficient to meet these standards and thus would deny Defendants' request for judgment on mental anguish damages stemming from Coxwell's retaliation if Defendants had preserved the objection at trial.

### C. Sufficient evidence: Sexual Harassment

The court would reach the same result for damages stemming from Coxwell's outrageous conduct and invasion of Trantham's privacy if Defendants had preserved an objection to those damages.

Because both claims arise under state law, the court looks to state law to determine whether Trantham presented enough evidence of emotional distress/mental anguish to present claims for emotional distress/mental anguish damages to the jury. *See Myers v. Cent. Florida Invs., Inc.*, 592 F.3d

24

1201, 1212 (11th Cir. 2010). Under Alabama law, "[o]nce the plaintiff has presented some evidence of mental anguish, the question whether he should recover for such mental anguish, and, if so, how much is a question reserved for the jury." *Slack v. Stream*, 988 So. 2d 516, 531 (Ala. 2008). But "[w]hen a plaintiff's testimony amounts to little more than the obvious notion that dealing with the traumatic event was 'hard' or 'humiliating,'" the Alabama Supreme Court has "consistently remitted damages." *Id.* at 532.

Trantham testified that her husband's death "changed my whole life," (doc. 359, p. 119), and she suffered from depression and anxiety because of it. (*Id.*, p. 136). Coxwell knew this (*id.*, p. 125), making his ongoing harassment disgusting in Trantham's eyes (*id.*, p. 135). Trantham testified that she reacted to Coxwell's April 13th 'sport-fucking' comment like this:

> Q.   What was your reaction?
>
> A.   I just got up and walked out.  I mean, what could I do?
>
> Q.   You needed the job, right?
>
> A.   I needed a job.  I felt like with a job that I had security, that I could take care of myself.  I was alone.  I didn't have any family support. My husband was gone. And I was petrified. I suffered from depression. He knew that when he hired me. I suffered from anxiety. He knew that when he hired me.

(*Id.*, p. 136). She later added that the comment was "way more than offensive." (*Id.*, p. 141).

As for Coxwell exposing himself, Trantham testified on cross-examination:

> Q.   Okay.  And how would you describe your feelings?  Was it disappointing?
>
> A.   My feelings were -- I didn't know what I was going to do.
>
> Q.   Okay.
>
> A.   I needed to work.

> Q.   Was it frightening?
>
> A.   Yes, it was frightening.
>
> Q.   Okay.
>
> A.   It was degrading.  It was humiliating.  I was afraid.  I have never lived on my own before in my life.  My husband died at 50 years old of a massive heart attack after he went to bed one night.
>
> Q.   All right.
>
> A.   In one night, my whole life changed, my whole world changed.
>
> Q.   Would you say that it was unforgettable?
>
> A.   What was unforgettable?
>
> Q.   We were talking about Mr. Coxwell exposing himself.
>
> A.   It was sickening. No, it wasn't unforgettable.  It was sickening that he would stoop so low to do something that dirty and that low because he thought that I had no power to do anything about it.

(*Id.*, p. 178). Trantham testified that she was so sickened that she started looking for a new job, despite needing the one she had. (*Id.*, p. 152).

Cam Coxwell Shiflett, Coxwell's daughter and one of the two defendants as personal representative to her father's estate, admitted that she too would be angry if her boss exposed himself or told her that a good "sport fucking" would help her get over her husband's death.[4] (Doc. 360, p. 108).

Again, this court's review of a jury's award "for intangible, emotional harm is deferential to the fact finder because the harm is subjective and evaluating it depends considerably on the demeanor of the witnesses." *Akouri*, 408 F.3d at 1344. The court finds that the testimony mentioned above is

---

[4] While Shiflett is a named defendant, the court does not treat her testimony as a judicial or party admission because she answered these questions on her own behalf, not on behalf of her father's estate.

sufficient to meet these standards and thus would deny Defendants' request for judgment on mental anguish damages stemming from Coxwell's outrageous conduct and invasion of Trantham's privacy if Defendants had preserved these objections at trial.

—

In sum, the court **DENIES** Defendants' Rule 50(b) motion for judgment as a matter of law but will require Trantham to choose between (a) a remitted back pay award $24,490.70 or (b) a new trial on back pay. The court now moves to Defendants' arguments for a new trial or other relief under Rule 59(a).

## B. Rule 59(a) arguments

### 1. Great weight of evidence

Defendants next argue that, if Trantham's personal testimony prevents judgment under Rule 50(b), they are still entitled to a new trial on all three counts under Rule 59(a) because the great weight of the evidence is against Trantham's version of events. Defendants essentially argue that their evidence is greater based on volume: "At bottom, all of the nine witnesses other than Trantham who testified either (i) did not offer testimony corroborating Trantham's account, in the case of Trantham's own witnesses, or (ii) directly contradicted Trantham's account." (Doc. 371, p. 37-38) (emphasis omitted).

But credibility can outweigh volume, and credibility determinations are left to the jury. Plus, the number of witnesses called by each party has little value when judging the events that occurred with only Trantham and Coxwell in the room (*e.g.*, the April 13th comment and the Friday penis exposure). Only Trantham and Coxwell have personal knowledge about what happened, and the court must assume that the jury believed Trantham, not Coxwell. As for evidence of Coxwell's character and pattern or practice, the court must similarly assume that the jury believed Laura and Hattie Williams's testimony that Coxwell continued harassing Laura after he fired Trantham, rather than Coxwell's group of witnesses who testified Coxwell would never act that way.

For these reasons, the court cannot find that the verdict is against the great weight of evidence. So the court must deny Defendants' Rule 59(a) motion

on all three counts. *See Lamonica v. Safe Hurricane Shutters, Inc.*, 711 F.3d 1299, 1312-13 (11th Cir. 2013) ("New trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great—not merely the greater—weight of the evidence." (cleaned up)).

### 2.  The "10 years of my life" comment

Defendants next argue that the jury's compensatory award is excessive, and thus against the great weight of the evidence, based on this testimony from Trantham:

> Q.  You heard Ms. Leonard in her opening statement talk about damages. I want to give you the opportunity personally to tell the jury what you are asking them to award you.
>
> A.  What is ten years of my life worth? Because of this case and because he had all the wealth, the money, the power, the influence, he took away my ability to go to work. He took that ability away from me.
>
> For ten years, I have been, minus the few times that I have managed to pick up a job short term, he took that away from me for no other reason than the fact that he could, that he could.
>
> What is ten years of somebody's life worth? I am not 45 years old anymore. I have issues now that may stop me from pursuing a job in my field that I worked so hard to—I didn't get a student loan to do anything. Everything I did came out of my pocket. Every class I took came out of my pocket.
>
> Q.  Do you have a dollar figure or are you just asking the jury to award you what is fair?
>
> A.  What they think is fair. How much ten years of somebody's life is fair. How much is it worth because you would not go along with what you knew to be wrong and what you held that—the bar cannot be so low in the workplace that people like Jim Coxwell can just slither under it because he thinks he has all

28

> the money and that power, that he can just crush you like a bug because you don't matter, you are not in his class.

(Doc. 359, pp. 146-147). Defendants argue that "[t]here is a high probability that the jury was confused by Trantham's testimony, believing that she would be entitled to damages for ten years' worth of unemployment, pain, and suffering. That is plainly improper." (Doc. 371, pp. 38-39). The court rejects this argument for two reasons.

First, Defendants did not object to this testimony (doc. 359, pp. 146-47), so they have waived any argument that the testimony was improper. Nor did Defendants object to the court's jury instructions about calculating damages, so they have waived any argument that the court wrongly told jury how to consider Trantham's testimony about the length of her damages.

Second, Defendants cannot show any error or harm. Let's start with the jury's award for back pay. As explained, Trantham's attorney asked the jury for only *one* year of back pay, and the jury awarded Trantham the exact number her attorney asked for. That the jury didn't multiple the requested award by ten is a strong indication that the jury did not improperly believe it was supposed to award 10 years' worth of back pay damages. Plus, Trantham testified that she went back to work at the lodge in 2017 (doc. 159, p. 140), so there is no reason to believe that the jury wrongly believed that Trantham testified that she was seeking compensation for 10 years' of lost wages.

On the other hand, neither Defendants nor the court can say what time period the jury considered when calculating damages for mental anguish or emotional distress. Perhaps the jury decided all of Trantham's emotional damage occurred within the first two years; perhaps they decided it continued through trial. But even if the jury decided the latter (10 years), Defendants show no legal error. As for the sexual harassment-based claims, Alabama law defines "past damages" as "damages and losses suffered or incurred prior to the date of judgment." Ala. Code § 6-11-2. And the Alabama Supreme Court has affirmed a jury's award of mental anguish damages suffered through the start of trial. *See Alabama Power Co. v. Murray*, 751 So. 2d 494, 500 (Ala. 1999) (affirming award of fire victim who presented evidence that she still had headaches and emotional pain "at the time of trial"). As for the federal

retaliation claim, the Eleventh Circuit similarly allows evidence of extended emotional distress like post-incident marital and familial problems and personality changes. *See Ash v. Tyson Foods, Inc.,* 664 F.3d 883, 900 (11th Cir. 2011). Defendants cite no cases, nor has the court seen any, that limit the period of emotional and mental damages to a short period after the actionable incident. So Defendants are not entitled to a new trial on Trantham's damages.

—

On a final note: the court presided over this trial and thus knows (as the parties know) that Trantham's "10 years of my life" comment alluded to how long she waited to have her day in court, a period that was greatly extended because Coxwell kept seeking criminal charges against Trantham. *See supra*, p. 5 n.2. The court ensured that the jury never learned these facts, going so far as to hold a sidebar with the attorneys when Defendants' counsel was about to ask about the 10-year comment during cross-examination. (Doc. 359, p. 184-85). As the court said then: "She did a very good job of giving her frustration about the ten years without ever crossing the line as to why she is frustrated. All of us get it, but the jury doesn't." Because the jury was never told why Trantham waited 10 years for trial, the court cannot find that the jury used Trantham's "10 years of my life" comment for an improper purpose.

### 3. Excessive damages: Mental Anguish and Emotional Distress

Defendants also argue that the amount of the compensatory awards the jury gave Trantham are excessive because of "[t]he paltry nature of her evidence, which consists exclusively of her testimony[.]" (Doc. 371, pp. 40-41). Defendants ask the court to either order a new trial on damages on all claims or remit the damages to $1 on each claim. The court has ordered remittitur on the back pay award, *see supra* Part III(A)(2), so the court confines this discussion to the mental anguish and emotional distress awards.

### A. Retaliation (Trantham's firing)

Defendants rely on their Rule 50(b) argument to support their Rule 59(a) argument, so the court recounts the evidence that it found supported presenting the damages issue to the jury. As mentioned, Trantham testified about her anger when Coxwell fired her in retaliation:

> Q.   After Mr. Coxwell terminated you, were you mad at him?
>
> A.   I think it was a combination of some anger but mainly hurt because I had worked really hard for him. I had worked seven days a week. I was on call 24 hours a day. Not even housekeeping was on call 24 hours a day. Not even maintenance was on call 24 hours a day. I worked every holiday, every holiday so the other employees could be with their families because I didn't have any family.

(Doc. 359, pp. 142-43). Gereka Ford, Donnie Gilbert, and Edwin Williams all confirmed that Coxwell's firing upset Trantham. *See* (doc. 360, p. 178) (Gilbert); (doc. 361, p. 21) (Ford); (doc. 361, p. 50) (Williams). Williams, for example, testified that Trantham was so angry that she was "throwing some things." (Doc. 361, p. 50). Ford, who was also present, confirmed Trantham's anger but testified that her anger was "understandable" because Coxwell "fired her in front of everyone, generally strangers, you know." (Doc. 361, p. 21).

On top of her immediate anger and frustration, Trantham testified that Coxwell's retaliation also "took away my ability to go to work . . . minus the few times that I have managed to pick up a job short term." (Doc. 359, p. 146). As mentioned throughout, Trantham took the job at Long Leaf Lodge because her husband recently died, leaving Trantham to fend for herself:

> Q. You needed the job, right?
>
> A. I needed a job. I felt like with a job that I had security, that I could take care of myself. I was alone. I didn't have any family support. My husband was gone. And I was petrified. I suffered from depression. He knew that when he hired me. I suffered from anxiety. He knew that when he hired me.

(Doc. 359, p. 136). Firing Trantham thus left her in the stressful situation of lacking financial support.

Defendants offered no evidence to counterbalance the weight of Trantham's testimony. So even though Trantham could have testified in more detail about any long-term mental or emotional damage that Coxwell's

31

retaliation caused, this testimony is more than enough to support an award for mental anguish and emotional damages and is not against the great weight of the evidence. As mentioned, general compensatory damages "need not be proven with a high degree of specificity." *Akouri*, 408 F.3d at 1345. And this court's review of a jury's award "for intangible, emotional harm is deferential to the fact finder because the harm is subjective and evaluating it depends considerably on the demeanor of the witnesses." *See id.* at 1344.

The court therefore finds that the evidence supports the jury's compensatory award of $200,000, far more than Defendants' requested remitted amount of $1. *See Ash*, 664 F.3d at 899-900 (affirming denial of a motion for a new trial or remittitur of $300,000 award for mental and emotional anguish stemming from Title VII retaliation). As a result, the court denies Defendants' Rule 59(a) motion to either remit or hold a new trial to redetermine mental anguish and emotional damages for Coxwell's retaliation.

## B. Outrage and Invasion of Privacy (Sexual Harassment)

The jury awarded Trantham $400,000 for mental anguish and emotional damages stemming from Coxwell's invasion of her privacy and $600,000 for mental anguish and emotional damages stemming from Coxwell's outrageous conduct. Defendants ask the court to either order a new trial on both awards or remit each to $1.[5] Because Defendants again rely on their Rule 50(b) argument to support their Rule 59(a) argument, the court recounts the evidence that it found supported presenting the damages issue to the jury.

1. *Invasion of privacy*: As for Coxwell's invasion into Trantham's private life, Trantham told the jury that her husband John's death "changed my whole life," (doc. 359, p. 119), and that she suffered from depression and anxiety

---

[5] Defendants did not object to the court's jury instructions and verdict form that allowed the jury to provide distinct awards for outrage and invasion of privacy, nor do Defendants argue after trial that permitting the distinct awards would amount to a double recovery for the same mental and emotional injury stemming from Coxwell's acts of sexual harassment. *See St. Luke's Cataract and Laser Instit., P.A. v. Sanderson*, 573 F.3d 1186, 1203 (11th Cir. 2009) ("It is clear that no duplicating recovery of damages for the same injury may be had."). So the court considers the issue waived. Further, it would be difficult to rule out the possibility that the jury considered Trantham's emotional damage stemming from Coxwell's sexual harassment to be a combined $1 million, then allocated $400,000 for Coxwell prying into Trantham's personal/sexual life and $600,000 for the distinct, outrageous act of exposing himself. *See Kadiyala v. Pupke*, 2024 WL 33910, at *2 (11th Cir. Jan. 3, 2024) (unpublished) (reversing trial court's remittitur for double recovery "because the jury was not prohibited from allocating its total damages award between Mark and Marie through the different causes of action").

because of it. (*Id.*, p. 136). Coxwell knew that Trantham was suffering from depression, yet conducted a months-long, consistently-rebuffed campaign to start a sexual relationship with her. That Coxwell knew about Trantham's emotional struggle made his ongoing harassment disgusting in Trantham's eyes, particularly the times when Coxwell would talk about his penis size or rub his groin at her desk. (*Id.*, p. 135).

Then came the second anniversary of John's death, when Coxwell told Trantham that a good "sports fucking" would help her get over the grief. Trantham testified that she reacted to Coxwell's comment like this:

> Q.    What was your reaction?
>
> A.    I just got up and walked out.  I mean, what could I do?
>
> Q.    You needed the job, right?
>
> A.    I needed a job.  I felt like with a job that I had security, that I could take care of myself.  I was alone.  I didn't have any family support. My husband was gone. And I was petrified. I suffered from depression. He knew that when he hired me. I suffered from anxiety. He knew that when he hired me.

(*Id.*, p. 136). On cross, she told Defendants' counsel that the comment was "way more than offensive." (*Id.*, p. 141).

Defendants offered no evidence to counterbalance the weight of Trantham's testimony. To the contrary, Coxwell's daughter testified that, if her father made that comment, it would make a reasonable person angry. (Doc. 360, p. 108). So even though Trantham could have testified in more detail about any long-term mental or emotional damage that Coxwell's invasion caused, her testimony is more than enough to support an award for mental anguish and emotional damages and is not against the great weight of the evidence. As mentioned, general compensatory damages "need not be proven with a high degree of specificity." *Akouri*, 408 F.3d at 1345. And this court's review of a jury's award "for intangible, emotional harm is deferential to the fact finder because the harm is subjective and evaluating it depends considerably on the demeanor of the witnesses." *See id.* at 1344.

33

The court therefore finds that the evidence supports the jury's compensatory award of $400,000, far more than Defendants' requested remitted amount of $1. As a result, the court denies Defendants' Rule 59(a) motion to either remit or hold a new trial to redetermine mental anguish and emotional damages for Coxwell's invasion of Trantham's privacy.

2. *Outrage*: The court addressed this issue at length in Part III(A). As a refresher, the court held that a jury could find that Coxwell's months-long series of sexual acts—culminating in Coxwell exposing his penis to Trantham in a storage room—was "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Inmon*, 394 So. 2d at 365. Trantham testified that she found the exposure, "frightening," "degrading," "humiliating," and "sickening." (Doc. 359, p. 178). She testified that she was angry that Coxwell "would stoop so low to do something that dirty and that low because he thought that I had no power to do anything about it." (*Id.*). And despite her need for the paycheck, Trantham testified that she asked Coxwell the following Monday to let her find another job because "I couldn't take it anymore." (*Id.*, p. 137).

Defendants offered no evidence to counterbalance the weight of Trantham's testimony. To the contrary, Coxwell's daughter admitted that she too would be angry if her boss exposed himself. (Doc. 360, p. 108). So even though Trantham could have testified in more detail about any long-term mental or emotional damage that Coxwell's outrageous conduct caused[6], this testimony is more than enough to support an award for mental anguish and emotional damages and is not against the great weight of the evidence. As mentioned, general compensatory damages "need not be proven with a high degree of specificity." *Akouri*, 408 F.3d at 1345. And this court's review of a jury's award "for intangible, emotional harm is deferential to the fact finder because the harm is subjective and evaluating it depends considerably on the demeanor of the witnesses." *See id.* at 1344.

---

[6] To be fair, it was difficult for Trantham to testify about long-term effects without violating the court's ruling that neither party could introduce evidence about Defendants' efforts to have Trantham criminally charged after she filed the lawsuit. (Doc. 348) Having presided at trial, the court knows Trantham had more that she wanted to say about Coxwell's impact on her life but couldn't.

The court therefore finds that the evidence supports the jury's compensatory award of $600,000, far more than Defendants' requested remitted amount of $1. In fact, the court cannot imagine an award of nominal damages for a claim that clears the high bar set for the state-law tort of outrage. *See, e.g.*, *O'Rear v. B.H.*, 69 So. 3d 106 (Ala. 2011) (affirming $1 million compensatory award on outrage verdict stemming from a doctor providing his minor patient with opioids in return for sex); *Cont. Cas. Ins. Co. v. McDonald*, 567 So. 2d 1208 (Ala. 1990) (affirming a $750,000 compensatory award on outrage verdict stemming from the outrageous handling of an insurance claim). As a result, the court denies Defendants' Rule 59(a) motion to either remit or hold a new trial to redetermine mental anguish and emotional damages for Trantham's outrage claim.

### 4. Excessive Punitive Damages

Finally, Defendants argue that the jury's awards of punitive damages violate the Due Process Clause.[7] As a reminder, the jury doubled each compensatory award of mental anguish and emotional damages to determine the corresponding punitive award:

| Claim | Compensatory Award | Punitive Award |
| --- | --- | --- |
| Retaliation | $200,000 | $400,000 |
| Invasion of Privacy | $400,000 | $800,000 |
| Outrage | $600,000 | $1,200,000 |

Below, the court explains why it finds that none of these 2:1 punitive awards is unconstitutional, starting by reciting the standard of review.

---

[7] In one line, Defendants also say that the punitive damages awards are "unsupported by the evidence and should be struck or remitted." (Doc. 371, p. 41). But Defendants do not develop this argument and waived any argument that the evidence didn't support submitting the issue of punitive damages to the jury by not making that argument in a Rule 50(a) motion. So the court focuses its attention solely on the Due Process issue, just as Defendants do.

## A. Applicable Standard

To determine whether a punitive damages award violates Due Process, the court must first "identify the state's interest in deterring the relevant conduct and the strength of that interest." *Myers*, 592 F.3d at 1218. The court must then consider (1) the degree of reprehensibility of Coxwell's misconduct; (2) the disparity between the actual or potential harm suffered by Trantham and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and civil penalties authorized or imposed in comparable cases. *See BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575–83 (1996). The court applies this test to each claim in the order they appeared in the jury's verdict.

## B. Retaliation

Again, the jury awarded Trantham $400,000 in punitive damages on her § 1981 retaliation claim, on top of the jury's award of $200,000 for emotional pain and mental anguish plus $25,295.50 in back pay.

1. *Government's interest*: Section 1981 was "designed to eradicate blatant deprivation of civil rights," *Comcast Corp. v. Nat'l Assoc. of African Am. Owned Media*, 589 U.S. 327, 335–36 (2020) (quotations omitted), and was enacted "in the aftermath of the Civil War to vindicate the rights of former slaves." *See id.* at 333. So the Government has a strong interest in deterring employers from retaliating against employees who oppose illegal race discrimination, and the court thus moves on to the three *Gore* guideposts.

2. *Degree of reprehensibility*: Reprehensibility is the first and most important factor when determining whether a punitive damages award is excessive. *See Gore*, 517 U.S. at 575. "To determine the reprehensibility of a defendant's conduct, the court must consider several issues: (1) whether the harm caused was physical as opposed to economic; (2) whether the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; (3) whether the target of the conduct was financially vulnerable; (4) whether the conduct involved repeated actions or was an isolated incident; and (5) whether the harm was the result of intentional malice, trickery, or deceit, or mere accident." *Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1283 (11th Cir. 2008).

36

The first factor "suggests that the misconduct of [Coxwell] was reprehensible" because Trantham "suffered both economic harm and emotional and psychological harm." *See id.*

The second factor weighs against a punitive damages award because Trantham's firing did not reflect an indifference to or reckless disregard of Trantham's health or safety.

The third factor supports the punitive award because Trantham testified that she needed a job to take care of herself, that she had no family support, and that her husband dying was the first time that she had ever been out on her own. (Doc. 359, p. 136). That Coxwell *knew* this makes the factor weigh even more toward a punitive award.

At first blush, the fourth factor seems to lean against the punitive award because Coxwell fired Trantham only one time. But in assessing factor #4, it is appropriate to consider whether Coxwell "engaged in a pattern of reckless indifference to [his] employees' federal rights." *See Goldsmith*, 513 F.3d at 1283. And Trantham testified that Coxwell had a pattern and practice of discriminating against black employees. When Coxwell fired Steven Holt, he told him to get his "black ass of my property." (Doc. 359, p. 123). Coxwell would not allow Trantham to reprimand or otherwise discipline her brother for referring to three housekeepers as "three lying black bitches." (Doc. 359, p. 130). Coxwell then told Trantham's brother that he believed him about the housekeepers being "just three lying niggers." (Doc. 359, p. 130). When Trantham reproached Coxwell and explained that he was playing into racial stereotypes by telling two other black housekeepers that "this was not the welfare office," Coxwell told her that "it was his damn business and he could run it any fucking way he wanted to." (Doc. 359, p. 126-127). And when Trantham explained her misgivings about firing Gereka Ford, Coxwell responded that Trantham "wasn't going to place more value on some little nigger than . . . his daughter." (Doc. 359, p. 133). Finally, after Trantham hired Jonoah Pressley, Coxwell told her that he was unhappy with Trantham's hiring practices and "that he was sick and tired of [her] turning the lodge into the ghetto lodge and hiring nothing but hood rats." (Doc. 359, p. 133). A few weeks after that conversation, Coxwell fired Trantham. (Doc. 359, p. 138, lines 1–7). This evidence suggests that Coxwell was repeatedly indifferent to his

employees' rights to be free from race discrimination prohibited by § 1981, so the court finds that the fourth factor favors the punitive award.

As for the fifth factor, when viewing the evidence in Trantham's favor, the record suggests that Coxwell's repeated actions resulted from intentional malice rather than a mere accident. When asked in his deposition about why he took away Trantham's right to hire and fire people (*i.e.*, fired her), Coxwell said it was because she wouldn't "select the right people." (Doc. 360, p. 234, lines 14–15). Further, Socoper, Inc. didn't have an employee handbook, and Coxwell didn't know whether there were any company policies against discrimination in the workplace. (Doc. 359, p. 203, lines 9–25). So it was reasonable to infer that Coxwell wasn't making a good-faith attempt to comply with federal civil rights laws and that he intended to fire Trantham for refusing to discriminate against black employees and job applicants. *See Goldsmith*, 513 F.3d at 1282 (finding evidence of malice or reckless indifference to employees' federal rights when jury determined that the employer had not made a good-faith attempt to comply with the law by adopting an antidiscrimination policy).

Because the court finds that four of the five factors favor the jury's punitive award, the court finds that the reprehensibility guidepost favors upholding the $400,000 punitive award.

3. *Disparity of harm*: The court must next compare the jury's punitive damages award to the harm that Coxwell caused, *Gore*, 517 U.S. at 575, mindful that "single digit multipliers are more likely to comport with due process, while still achieving the State's goal of retribution and deterrence, than awards with ratios in range of 500 to 1, or in this case 145 to 1." *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003) (citations omitted).

The jury found that Trantham's retaliatory firing caused her to suffer $200,000 in mental anguish and $25,295.50 in lost wages. The 2:1 ratio between Trantham's psychological harm and the punitive damages awarded does not "raise[ ] a red flag that the punitive damage amount likely violates the due process clause." *See Williams v. First Advantage LNS Screening Solutions Inc.*, 947 F.3d 735, 755 (11th Cir. 2020). And the Eleventh Circuit has upheld a higher 9.2:1 ratio when the employer's disregard of his employee's

federal rights "was exceedingly reprehensible, and there was evidence of a pattern of retaliatory and discriminatory misconduct." *See Goldsmith*, 513 F.3d at 1283–84. So the court finds that the disparity of harm guidepost weighs in favor of the punitive damages awarded being constitutionally permissible.

4. *Civil penalties*: "The third [*Gore*] factor, which is accorded less weight in the reasonableness analysis than the first two guideposts, involves a comparison between the punitive damages award and the civil penalties authorized or imposed in comparable cases." *Kemp v. AT&T Co.*, 393 F.3d 1354, 1364 (11th Cir. 2004). "The appropriate points of comparison include the actual fine imposed by statute or the outer bounds of punitive damages awarded in similar cases." *Edwards v. Grubbs*, __ F.4th __, 2026 WL 706637, at * 13 (11th Cir. 2026).

Starting with civil penalties, § 1981 does not impose a cap on compensatory or punitive damages, *see* 42 U.S.C. § 1981a(b)(4), unlike Title VII, which limits a plaintiff's damages to a range of $50,000 to $300,000 depending on the employer's size. *See* 42 U.S.C. § 1981a(b)(3). As for similar cases, the court needn't look further than the trial of Trantham's co-plaintiff, Laura Williams. *See Williams*, 947 F.3d at 765–66 (comparing the conduct of the defendants in cases with relevant punitive damages awards to determine whether award was unconstitutionally excessive). The first jury awarded Williams the same $400,000 in punitive damages on her § 1981 retaliation claim that the current jury awarded Trantham on her § 1981 retaliation claim. (*See* Doc. 252, pp. 1–2 (awarding $200,000 in punitive damages against Coxwell and $200,000 in punitive damages against Socoper)).

Because Congress chose not to cap punitive damages in § 1981 cases, and Trantham's co-plaintiff received the same punitive award as Trantham, the court finds that the final *Gore* guidepost favors the jury's punitive award.

—

In sum, the court finds that the Government has a strong interest in deterring race-based retaliatory conduct like Coxwell's, and all three *Gore* guideposts favor upholding the jury's punitive damage award. With all signs pointing in the same direction, the court denies Defendants' motion to declare the punitive award for Trantham's § 1981 retaliation claim unconstitutional.

## C. Invasion of Privacy & Outrage

Because the final two counts share many of the same facts and government interests in curbing sexual harassment, the court combines its review of the jury's $800,000 punitive damage award on Trantham's invasion of privacy claim and its $1.2 million award on Trantham's outrage claim.

1. *State's interest*: The Eleventh Circuit has found that states have a strong interest in protecting workers from sexual discrimination and harassment at work through common-law torts that can "correct evil-doing in areas not covered by the criminal law." *See Myers*, 592 F.3d at 1218–19 (discussing Florida's interest in using punitive damages as a deterrent). And as discussed, Alabama criminalizes the exposure of one's genitals for self-satisfaction, showing the strength of the State's interest in deterring such conduct. *See* Ala. Code § 13A-6-68. So the court moves on to weighing the three *Gore* guideposts.

2. *Degree of reprehensibility*: Again, reprehensibility is the first and most important factor when determining whether a punitive damages award is excessive. *See Gore*, 517 U.S. at 575. And the court must consider five issues when determining the degree of reprehensibility: (1) whether the harm caused was physical rather than economic; (2) whether the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; (3) whether the target of the conduct was financially vulnerable; (4) whether the conduct involved repeated actions or was an isolated incident; and (5) whether the harm resulted from intentional malice, trickery, or deceit, or mere accident. *Goldsmith*, 513 F.3d at 1283.

The first factor "suggests that the misconduct of [Coxwell] was reprehensible" because Trantham suffered "emotional and psychological harm" stemming from Coxwell's repeated acts of sexual harassment. *Id.* So it weighs in favor of the jury's punitive awards.

As for the second factor, Coxwell disregarded Trantham's mental health. Coxwell knew that Trantham was suffering from depression after losing her husband. Coxwell was not only indifferent to that depression, he flippantly told Trantham she could get over her husband's death with a good 'sports fucking.' Thus, while Coxwell may not have put Trantham's *physical* health at risk, he

40

toyed with her mental health. So the court finds this factor favors the jury's punitive awards.

Under the third factor, Trantham's financial vulnerability is the same as it was for her § 1981 retaliation claim. So the court again finds that this factor favors the jury's punitive awards.

And the final two factors once again weigh heavily in favor of the punitive awards. Coxwell harassed Trantham throughout the last six months she worked at the lodge. He first asked her out on Valentine's Day. (Doc. 359, p. 134). He then escalated his advances by telling Trantham about his sexual desires, essentially asking Trantham to guess how big his penis was, and propping his leg on the edge of Trantham's desk while rubbing his groin. (Doc. 359, p. 134; Doc. 359, p. 135). When Trantham made it clear that she wasn't interested, Coxwell told her that her market value as a woman wasn't what it used to be and that it would be best if she accommodated him. (Doc. 359, p. 135, lines 9–15). Coxwell's harassment culminated in the two final acts this court declared egregious enough to justify state-law outrage. First, when Coxwell observed Trantham struggling emotionally on the second anniversary of her husband's death, he callously told her: "A good sport's fucking would get you over your husband." (Doc. 359, pp. 135-136). Second, Coxwell exposed himself to Trantham when they were alone in the supply closet. (Doc. 359, pp. 136–137).

These acts against Trantham alone would be enough to show that Coxwell's conduct involved repeated actions. But Trantham wasn't the only lodge employee whom Coxwell harassed. Once, Coxwell asked if Laura Williams would be at her grandson's birthday party in a bikini because he wanted "to get me a room so I can watch." (Doc. 360, p. 45). And more than once, Coxwell asked Laura Williams about her sex life. (Doc. 360, pp. 46, 59–60). Coxwell would also inappropriately touch Laura and Hattie Williams by hugging against them, kissing them on the forehead, and rubbing "his private all on [their] leg[s]." (Doc. 360, pp. 48–49). On Laura Williams' last day of work, Coxwell told her that he would take her to his house, tie her down, and never let her go. (Doc. 360, p. 57–58). Thus, Coxwell engaged in repeated sexual harassment of his employees, making the fourth factor weigh heavily in favor of punishing Coxwell's behavior.

Viewing the evidence in Trantham's favor, Coxwell also acted with intentional malice. Coxwell knew that Trantham suffered from depression and anxiety over her husband's death, yet he callously told Trantham "[a] good sport's fucking would get you over your husband." (Doc. 359, pp. 135–36). And Trantham said that when Coxwell exposed himself to her, he was "standing there like he won the lottery ticket, smiling like he had just won the lottery ticket." (Doc. 359, pp. 180–81). So the final factor also weighs heavily in favor of the punitive damages awards.

In short, all five reprehensibility factors favor the $800,000 and $1.2 million punitive damages awards.

3. *Disparity of harm*: As discussed, the jury used a 2:1 ratio to determine the punitive award on each count, and a 2:1 ratio does not "raise[ ] a red flag that the punitive damage amount likely violates the due process clause." *See Williams*, 947 F.3d at 755. So this guidepost weighs in favor of the $800,000 and $1.2 million punitive damages awards.

4. *Civil penalties*: The final guidepost weighs in Defendants' favor. Again, the Eleventh Circuit recently said that "[t]he appropriate points of comparison include the actual fine imposed by statute or the outer bounds of punitive damages awarded in similar cases." *Edwards v. Grubbs*, __ F.4th __, 2026 WL 706637, at * 13 (11th Cir. 2026).

The court starts with the actual fine imposed by Alabama statute. As noted, Alabama has not passed a sexual harassment statute, thus its reliance on the common-law torts of outrage and invasion of privacy. But Alabama has criminalized the type of genital exposure that Coxwell performed. *See* Ala. Code § 13A-6-68. A first-time conviction for exposure is considered a Class A misdemeanor, which subjects the offender to no more than 1 year in county jail and a $6,000 fine. *See* Ala. Code §§ 13A-5-7 (jail); 13A-5-12 (fine).

Finding similar sexual harassment cases with a punitive damage award is difficult. As discussed, most state-law tort of outrage cases do not present facts sufficient to survive a Rule 12 or Rule 56 motion, and the court suspects that most cases that do survive dispositive motions settle because Defendants do not wish to face a jury with such outrageous facts. So the court expanded its search to sexual harassment cases pleaded under state-law outrage, state-law

invasion of privacy, and federal statutory sexual harassment claims (including, but not limited to, hostile work environment or retaliation). The court finds these four cases most relevant, in decreasing order of the punitive award:

- o *O'Rear v. B.H.*, 69 So. 3d 106 (Ala. 2011), *abrogated on other grounds by Ex parte Vanderwall*, 201 So. 3d 525 (Ala. 2015): Dr. O'Rear traded opioids with a 14-year-old patient for sex several times. The jury found that Dr. O'Rear had committed the tort of outrage (among other torts) and awarded the same amount here: $1 million in compensatory damages and **$2 million** in punitive damages. The Supreme Court of Alabama affirmed the compensatory award; Dr. O'Rear did not challenge the punitive award.

- o *Laura Williams v. Socoper, Inc.*: Our first jury awarded Trantham's co-plaintiff, Laura Williams, **$400,000** in punitive damages. (Doc. 252, p. 2). The evidence showed that Coxwell touched Williams, in addition to making similar comments to those he made to Trantham.

- o *Whitford v. Sub-Line Assoc., Inc.,* 2017 WL 3118810 (ALND 2017): James Connison sexually harassed his Subway store co-worker, Plaintiff Whitford by grabbing her breasts, slapping her buttocks, and making sexually-charged comments, including innuendo about the size of his penis. Whitford sued Sub-Line (the franchise owner). The jury found that Whitford proved state-law invasion of privacy and various forms of Title VII sexual harassment and awarded her $30,000 for emotional pain and **$100,000** in punitive damages.

- o *Holton v. Bama Lanes Prattville, LLC*, 2019 WL 6712085 (ALMD 2019): Defendant Williams made sexually-charged comments to his co-worker Plaintiff Holton about her clothes and repeatedly rubbed her shoulders despite Holton's complaints. Williams also asked Holton to come to his truck and "bang him" several times. The jury found that Williams committed the tort of invasion of privacy and awarded her $3,000 in compensatory damages and **$3,000** in punitive damages. (Doc. 371-7).

43

None of these cases is a perfect fit. But what weight they offer favors Defendants. Of the four, *Williams* is the best comparator because it involves the same defendant, similar allegations, and the only supervisor-subordinate scenario. But Trantham's facts are more extreme, more personal, and longer-term. *Holton* and *Whitford* both involved touching but involved peer-on-peer harassment that was better addressed by the employer than this case, where Coxwell (the harasser) was the employer-owner. And *O'Rear*, which involves the same award Trantham received presented worse facts because it involved statutory rape and the facilitation of a drug addiction.

Putting it all together, the court finds that the facts here are worse than *Williams* ($400,000) but not as bad as *O'Rear* ($2 million), so this jury's award seems excessive under the third *Gore* guidepost. But the weight of this fact is tempered by the countervailing fact that Alabama law has criminalized one piece of Coxwell's harassment (exposure), *see* Ala. Code § 13A-6-68, and has chosen to permit punitive awards of more than $500,000 if the compensatory to punitive ratio does not exceed 3:1, which it does not. Ala. Code § 6-11-21(a).

—

In sum, the court finds that the Government has a strong interest in deterring sexual harassment akin to Coxwell's treatment of Trantham, and two of the three *Gore* guideposts favor upholding the jury's punitive damage award. If the court limited its constitutional review to the third *Gore* guidepost (*i.e.,* comparison to penalties and similar awards), it would likely hold that the maximum punitive award constitutionally allowed for Coxwell's acts of sexual harassment is closer to $1 million than the $2 million that the jury awarded. But three things prevent the court from remitting the award to $1 million.

First, the Supreme Court found a due process violation in *Gore* because BMW lacked notice that its conduct could result in such a large award:

> Elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose. Three guideposts, each of which indicates that BMW did not receive adequate notice

> of the magnitude of the sanction that Alabama might impose for adhering to the nondisclosure policy adopted in 1983, lead us to the conclusion that the $2 million award against BMW is grossly excessive: the degree of reprehensibility of the nondisclosure; the disparity between the harm or potential harm suffered by Dr. Gore and his punitive damages award; and the difference between this remedy and the civil penalties authorized or imposed in comparable cases.

*Gore*, 517 U.S. at 574–75 (highlighting added). Unlike *Gore*, where the Supreme Court found no notice that a $2 million punitive award for deceptive trade practices was possible, *id.* at 583–84, the jury's $2 million punitive award in *O'Rear* was published by the state supreme court 2+ years before Coxwell hired Trantham. So Coxwell had notice that a jury *could* award $2 million in punitive damages for conduct so egregious that it amounted to the tort of outrage.

Second, the Circuit Court has said that excessiveness under the third guidepost alone is "not enough, by itself, to suggest that the punitive damages award violates due process." *Bogle v. McClure*, 332 F.3d 1347, 1362 (11th Cir. 2003). In fact, the Supreme Court has said that the first guidepost (reprehensibility) is the "most important indicium of the reasonableness of a punitive damage award." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003). Here, the reprehensibility of Coxwell's sexual harassment is strong enough to overcome any gap between the $1 million cap suggested by a review of similar cases. *See Bogle*, 332 F.3d at 1362 (applying this principle to affirm punitive awards exceeding $4 million per defendant despite Title VII's analogous statutory cap of $300,000).

Third, Defendants do not suggest a specific constitutional boundary for this award; they instead ask the court to "order a substantial reduction in the $800,000 punitive award on Claim 2 and the $1,200,000 punitive award on Claim 3, bringing those awards within constitutional boundaries." (Doc. 371, p. 52). Earlier this month, the Circuit Court refused to pick a constitutional cap when the parties didn't suggest a specific cap:

45

The difficulty, we candidly admit, is trying to figure out the maximum amount of punitive damages that a jury could have constitutionally awarded on this record. Why, for example, shouldn't the reduced award be $2 million or $5 million instead of $1 million? The district court explained that a $1 million punitive damages award would "serve[ ] the purposes of punitive damages" without "surpassing 'the zone of arbitrariness that violates the Due Process Clause.' " D.E. 270 at 36 (quoting *BMW*, 517 U.S. at 568, 116 S.Ct. 1589). Maybe the district court was right, but it is not intuitively clear to us that $1 million is the constitutionally maximum award. Fortunately, we need not try to figure out ourselves whether a punitive damages award of $2 million or higher would have been constitutionally permissible. On appeal, Mr. Edwards has taken an all-or-nothing approach; he contends that no reduction was appropriate based on the BMW guideposts because the $20 million award is constitutional, and he does not suggest any alternative lower figure. On appeal, Officer Grubbs also does not address whether a different figure (such as $250,000, his alternative request below) would be constitutional.

"In our adversarial system of adjudication, we follow the principle of party presentation." *United States v. Sineneng-Smith*, 590 U.S. 371, 375, 140 S.Ct. 1575, 206 L.Ed.2d 866 (2020). This principle requires that "we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present." *See id.* (quoting *Greenlaw v. United States*, 554 U.S. 237, 243, 128 S.Ct. 2559, 171 L.Ed.2d 399 (2008)). In other words, "courts 'call balls and strikes'; they don't get a turn at bat." *Clark v. Sweeney*, 607 U.S. 7, 9, 146 S.Ct. 410, 223 L.Ed.2d 157 (2025) (quoting *Lomax v. Ortiz-Marquez*, 590 U.S. 595, 599, 140 S.Ct. 1721, 207 L.Ed.2d 132 (2020)). In the absence of adversarial briefing, we decline to weigh the potential constitutionality of awards between $1 million and $20 million. Accordingly, we affirm the reduction of the punitive damages award to $1 million.

*Edwards*, 2026 WL 706637, \*14–15. Like *Edwards*, our Defendants do not suggest a specific constitutional limit. So while the court could write an opinion that reasonably supports a constitutional cap of somewhere between $1 million and $2 million, the court isn't allowed to bat. And in its role as umpire, the court declines to weigh the potential constitutionality of awards between $1-2 million and simply declares that, based on the requisite *Gore* analysis, the jury's $2 million award found the strike zone. So the court denies Defendants' request to remit the punitive awards for invasion of privacy and outrage.

—

At bottom, the jury was presented with a classic 'he-said, she-said' case. The jury believed Trantham. And once you assume all of the facts as presented by Trantham are true, she presented an 'outrageous' case of sexual harassment and racially-charged retaliation. While the court may have awarded different amounts of damages, each of the jury's awards (except back pay) is supported by the evidence and does not violate statutory or constitutional caps. So except for the small remittitur of the jury's back pay award, the court must affirm the jury's verdict on all counts.

## CONCLUSION

For these reasons, the court **GRANTS IN PART** and **DENIES IN PART** Defendants' Rule 50(b) / Rule 59(a) motion. Specifically, the court:

- **DENIES** Defendants' Rule 50(b) motion for judgment on Trantham's outrage claim;

- **DENIES** Defendants' Rule 50(b) motion for judgment on Trantham's claim for back pay;

- **DENIES** Defendants' Rule 50(b) motion for judgment on Trantham's claim for mental anguish and emotional damages;

- **DENIES** Defendants' Rule 59(a) motion for a new trial on all three counts;

- **GRANTS** Defendants' Rule 59(a) motion for a new trial on Trantham's claim for back pay;

- **DENIES** Defendants' Rule 59(a) motion for a new trial on Trantham's claim for mental anguish and emotional damages; and,

- **DENIES** Defendants' Rule 59(a) motion to reduce the jury's award of punitive damages.

By April 10, 2026, Trantham must elect to either accept a remitted back pay award of $24,490.70 or re-try back pay damages.

**Done** and **Ordered** on March 31, 2026.

**COREY L. MAZE**
UNITED STATES DISTRICT JUDGE